771 F.2d 161
 38 Fair Empl.Prac.Cas. 1402,
37 Empl. Prac. Dec. P 35,463
UNITED STATES of America, Plaintiff-Appellee,
and
Carolyn J. Freeland, et al., Intervenor-Plaintiffs-Appellants,
v.
CITY OF CINCINNATI, Defendant-Appellee,
and
Queen City Lodge No. 69, Fraternal Order of Police,
Intervenor-Defendant- Appellee.
 No. 84-3615.
 United States Court of Appeals,
Sixth Circuit.
 Argued April 3, 1985.
Decided Aug. 29, 1985.
Rehearing Denied Oct. 16, 1985.
 
 Alphonse A. Gerhardstein (argued) Robert F. Laufman, John H. Burlew, Cincinnati, Ohio, for intervenor-plaintiffs-appellants.
 Nicholas Pantel, Asst. U.S. Atty., Cincinnati, Ohio, Civil Rights Div., U.S. Dept. of Justice, Washington, D.C., Wm. Bradford Reynolds, Walter W. Barnett, Dennis J. Dimsey, for the U.S.A.
 Richard A. Castellini (argued), M. Kathleen Robbins, Timothy M. Ruttle, Asst. City Solicitors, Cincinnati, Ohio, for City of Cincinnati.
 Donald E. Hardin (argued), Swain and Hardin, A Legal Professional Ass'n, Cincinnati, Ohio, for Queen City Lodge No. 69, FOP.
 Before LIVELY, Chief Judge, ENGEL, Circuit Judge, and COHN, District Judge.*
 LIVELY, Chief Judge.
 
 
 1
 This case, brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e, et seq., requires the court to consider the effect of a consent decree on seniority rights established by state law and a collective bargaining agreement. The district court concluded that its decision was controlled by Fire Fighters Local Union No. 1784 v. Stotts, --- U.S. ----, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984), and denied the claims of minority and female police department employees who were laid off or demoted in accordance with the seniority system. A group of intervenor plaintiffs have appealed, contending that even if Stotts required the district court to dissolve a previously entered permanent injunction, there were issues remaining for decision. After dissolving the injunction the district court ordered the case closed.
 
 I.
 
 2
 In 1980 the Department of Justice, on behalf of the United States, sued the City of Cincinnati, the Cincinnati Police Division (CPD) and the Cincinnati Civil Service Commission to enforce provisions of Title VII. In particular, the complaint charged that in hiring and promoting sworn police officers "[t]he defendants have pursued and continue to pursue policies and practices which discriminate against blacks and women and which deprive or tend to deprive these groups of employment opportunities or adversely affect their status as employees, because of their race or sex." Among the policies and practices identified in the complaint were the failure to recruit minority and female applicants and the utilization of non-validated written examinations and other selection standards having a detrimental impact on blacks and women. The complaint sought an injunction.
 
 
 3
 A document entitled "Joint Application for Entry of Consent Decree" was filed with the complaint. The application stated that the parties had engaged in extensive negotiations, resulting in a proposed consent decree which "resolves all the allegations raised by the complaint." The district judge signed the consent decree and it was filed that day. Shortly thereafter Queen City Lodge No. 69, Fraternal Order of Police, (FOP) filed a motion to intervene and vacate the consent decree. The intervenor stated that it was the collective bargaining representative of the sworn police officers of Cincinnati. The district court found that the FOP was entitled to intervention of right pursuant to Rule 24(a), Fed.R.Civ.P., and granted the motion. Approximately one year later on August 13, 1981, after extensive negotiations among all parties, a new consent decree was entered with agreement of the United States, the original defendants and the intervenor FOP. It was similar in most respects to the earlier one.
 
 
 4
 The consent decree contained a permanent injunction against acts and practices which had the effect of discriminating against police division employees, applicants and potential applicants for employment as police officers on the basis of race or sex. The decree established a long term goal of having the proportion of blacks and women in all sworn ranks of the CPD approximately equal to the proportion of qualified blacks and women in the labor force of the city. In order to reach this goal the decree also established interim goals and adopted an affirmative action plan which gave preferences to black and female applicants for entry level appointments to the police force and to such applicants for promotions.
 
 
 5
 The decree recited that the parties accepted it "as final and binding among the parties signatory hereto as to the issues resolved herein," that it did "not constitute an admission, adjudication or finding on the merits of the case, and that the defendants deny that any unlawful discrimination has occurred." The decree did not mention or deal with layoffs or demotions.
 
 II.
 A.
 
 6
 Early in 1983 the city was experiencing financial difficulties related to a national recession and determined to lay off a number of employees, including 23 police officers. Layoff notices were mailed to CPD employees with the least seniority as established by civil service rules and the collective bargaining agreement with FOP. Of the 23 officers proposed to be laid off three were black males, four were black females and seven were white females. All 23 persons scheduled for layoffs had the same day of hire and approximately 40 white male officers hired the same day were not to be laid off. Because of "bumping rights" based on seniority eight officers were scheduled for demotions, including four black males. Two of these four had the same seniority as white males who were not demoted.
 
 
 7
 Shortly after these layoffs and demotions were announced the district court permitted ten individuals affected by the layoffs to intervene as plaintiffs. The intervenor-plaintiffs sought an injunction enforcing the consent decree or modifying it to prohibit the application of the layoff and demotion policy in a manner that would reduce the percentage of minority employees in each classification below that which existed before the layoffs were announced. Several white women were also permitted to intervene as plaintiffs. Following a hearing the district court entered a preliminary injunction. The court found that the order of layoffs and demotions among officers having the same date of hire was based on "composite scores" which reflected, at least in part, an officer's performance on a written examination and in an interview at the time he or she was hired. The court also found that the layoffs would decrease significantly the percentages of black and female officers employed by the CPD. The demotions would result in similar decreases in the proportion of blacks and women in the positions of sergeant and specialist. These decreases would reverse a trend since the filing of the Title VII action under which the percentage of blacks and women in the division had increased, respectively, from 7% to 11.2% and from .95% to 4.8%.
 
 
 8
 The district court concluded since the employees to be laid off had the same date of hire as many white male employees who were retained the case "does not involve a conflict between affirmative action and seniority as it is classically regarded." The court found a strong likelihood that the intervenors would succeed on the merits and determined that the other requirements for granting a preliminary injunction were met. In entering a preliminary injunction the district court relied on its "inherent jurisdiction" to modify a consent decree when changed conditions require it.
 
 
 9
 The city abandoned the first layoff plan, but while the preliminary injunction was in force, the city determined that it needed to lay off 42 additional police officers. At this point the city moved the court to make the injunction permanent. The district court granted this motion and one result was that black and female officers were to be retained under the second layoff while at least four white male officers with longer actual service in the CPD were to be laid off. After the injunction was made permanent the intervening plaintiffs filed a motion for attorney fees and an order was entered granting attorney fees of $4,000, whereas the intervenors had sought $16,329. The United States and the FOP appealed from the permanent injunction.
 
 B.
 
 10
 While these appeals were pending the Supreme Court decided Stotts. In Stotts the Court held that a consent decree which did not deal with layoffs and demotions could not be the basis of an injunction prohibiting an employer from following the provisions of a bona fide seniority system in effecting layoffs. The United States and the FOP immediately filed a motion in the district court pursuant to Rule 60(b), Fed.R.Civ.P., for relief from judgment and a motion in this court for a remand of the case to the district court. The district court certified that it was prepared to act promptly on the joint motion and this court remanded the case. See First National Bank v. Hirsch, 535 F.2d 343 (6th Cir.1976). The intervenor-plaintiffs argued following remand that Stotts is distinguishable from the present case in several respects and that it does not deal with the right to prevent layoffs and demotions of minority and female officers having the same day of hire as white male officers who are not laid off or demoted. The intervenor-plaintiffs also filed a motion to compel discovery, asserting that the city had failed to answer certain interrogatories and to produce certain documents which it needed in order to show that the system used for layoffs involving "composite scores" had an impermissibly disparate impact on blacks and women.
 
 
 11
 The district court determined that Stotts controlled and entered an order dissolving the injunction and denying attorney fees. A separate order was entered denying the motion to compel discovery and directing the clerk "to close this case of record." This latter order stated, "Such action shall not be deemed to prejudice plaintiff/intervenors or any other person from instituting a new action at any time." The intervenor-plaintiffs have appealed from both orders.
 
 III.
 A.
 
 12
 In Stotts the Supreme Court emphasized again, as it had in Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), that in the absence of a showing of an intention to discriminate, Sec. 703(h) of Title VII, 42 U.S.C. Sec. 2000e-2(h), permits disparate treatment of employees pursuant to a bona fide seniority system. The fact that routine application on a bona fide seniority system has a discriminatory effect is not controlling. Congress felt that seniority systems are of sufficient importance in labor relations to make an exception to the generally broad sweep of Title VII in prohibiting discrimination resulting from employment practices. The Stotts Court found that the district court had exceeded its authority in entering an injunction which required white employees to be laid off when the negotiated seniority system would have required black employees with less seniority to bear the burden of a reduction in forces.
 
 
 13
 The district court in Stotts erred, the Supreme Court found, in basing its injunction on a consent decree which did not mention layoffs or demotions and which gave no indication of an intent to depart from the requirements of an existing seniority system or from the city's agreement with a union. The scope of a consent decree could not be expanded beyond the purposes expressed in it. Since the consent decree in Stotts did not purport to deal with layoffs and demotions, and since the city had a seniority system that controlled these events and which had been explicitly recognized in an earlier decree, it was error to enter an injunction to carry out unexpressed "purposes" of the decree.
 
 
 14
 The Court noted that since Sec. 703(h) protects bona fide seniority systems, "it is inappropriate to deny an innocent employee the benefits of his seniority in order to provide a remedy in a pattern or practice suit such as this." 104 S.Ct. at 2586. The Court then outlined the rights of employees who can prove that they are actual victims of discrimination resulting from application of a bona fide seniority system:
 
 
 15
 If individual members of a plaintiff class demonstrate that they have been actual victims of the discriminatory practice, they may be awarded competitive seniority and given their rightful place on the seniority roster. This much is clear from Franks v. Bowman Transportation Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) and Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Teamsters, however, also made clear that mere membership in the disadvantaged class is insufficient to warrant a seniority award; each individual must prove that the discriminatory practice had an impact on him. 431 U.S., at 367-71, 97 S.Ct., at 1870-1872. Even when an individual shows that the discriminatory practice has had an impact on him, he is not automatically entitled to have a non-minority employee laid off to make room for him. He may have to wait until a vacancy occurs,[11] and if there are non-minority employees on layoff, the Court must balance the equities in determining who is entitled to the job. Teamsters, supra, 431 U.S., at 37176, 97 S.Ct., at 1872-75. See also Ford Motor Co. v. EEOC, 458 U.S. 219, 236-240, 102 S.Ct. 3057, 3068-3070, 73 L.Ed.2d 721 (1982).
 
 
 16
 Id. at 2588.
 
 B.
 
 17
 The intervenor-plaintiffs seek to distinguish Stotts on three bases: (1) the consent decree in the present case has a broader purpose than the one considered in Stotts; (2) here the FOP was a party to the consent decree whereas the union was not a party to the decree in Stotts; and (3) the present case does not involve a bona fide seniority system. We consider the arguments in order.
 
 
 18
 (1)
 
 
 19
 The stated purposes of the two consent decrees are too nearly identical to be distinguishable on this ground. Both sought to avoid long and costly litigation by agreeing to an affirmative action plan which would bring about a better representation of minority groups in the safety forces of a city. Both bound the parties to long term goals and prescribed the methods of reaching these goals. Neither mentioned or purported to deal with layoffs and demotions. The "scope of a consent decree must be discerned within its four corners," Stotts, 104 S.Ct. at 2586 (quoting United States v. Armour & Co., 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971)), and a court may not broaden that scope and override the provisions of Sec. 703(h) to achieve a purpose not expressed in the decree or necessarily implied. The argument of the intervenor-plaintiffs is considerably weakened by their own brief in the district court when they were relying on this court's decision in Stotts v. Memphis Fire Department, 679 F.2d 541 (6th Cir.1982), rev'd --- U.S. ----, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). In that brief the intervenor-plaintiffs wrote, "The general obligations imposed on the City of Memphis in that decree were very similar to those imposed on the defendants herein."
 
 
 20
 (2)
 
 
 21
 The intervenor-plaintiffs argue that since the FOP was a party to the decree it must have signed with full realization that its affirmative action provisions would override the provisions of the seniority system. They point to the fact that the Supreme Court noted that the union was not a party to the consent decree in Stotts and could not be held to have agreed to any of its terms. Though the Supreme Court did note that the union in Stotts had not been a party to the consent decree, we do not consider the fact that the FOP did sign the decree in the instant case determinative of the issue. The FOP agreed to a consent decree which did not mention layoffs or demotions. By merely agreeing to preferences for blacks and women in hiring and in promotion decisions without any reference to layoffs or demotions which were covered by an existing seniority system the union cannot be held to have agreed to the forfeiture of one of the most jealously guarded prerogatives of American labor--to have important incidents of employment governed by seniority. We do not believe the absence of the union as a party to the consent decree was central to the decision in Stotts.
 
 
 22
 (3)
 
 
 23
 The intervenor-plaintiffs raised the issue of whether the seniority system was bona fide, at least indirectly in their motion to intervene and directly in their memorandum opposing the Rule 60(b) motion. The United States had argued from the beginning that the test scores were not part of a bona fide seniority system if used in such a way as to have a discriminatory impact. However, the United States has not pursued this issue in the present appeal. Instead, as pointed out, infra, the United States supports the dissolution of the injunction and argues that the question of the use of the test scores to rank same-day hires was properly relegated to a separate action. The district court acknowledged the issue in its findings of fact accompanying the preliminary injunction order and concluded that seniority was not an issue "as it is classically regarded" because the use of composite scores in ranking same-day hires was a non-temporal factor.
 
 
 24
 The arguments of the appellees diverge in response to the claim that the CPD did not have a bona fide seniority system. The FOP contends that the seniority system is a bona fide one since its principal features grant preferences on the basis of length of employment. This is the hallmark of a true seniority system. The FOP relies heavily on California Brewers Assn. v. Bryant, 444 U.S. 598, 100 S.Ct. 814, 63 L.Ed.2d 55 (1980). In California Brewers, Justice Stewart wrote for the Court:
 
 
 25
 In the area of labor relations, "seniority" is a term that connotes length of employment. A "seniority system" is a scheme that, alone or in tandem with non-"seniority" criteria,[13] allots to employees ever improving employment rights and benefits as their relative lengths of pertinent employment increase. Unlike other methods of allocating employment benefits and opportunities, such as subjective evaluations or educational requirements, the principal feature of any and every "seniority system" is that preferential treatment is dispensed on the basis of some measure of time served in employment.
 
 
 26
 Id. at 605-06, 100 S.Ct. at 819 (footnotes omitted).
 
 
 27
 The FOP argues that the ranking of persons hired the same day on the basis of composite scores does not present a separate issue. This is a non-seniority criterion which may be included though not strictly related to seniority and there is no need to consider the claims of those minority and female officers hired the same day as a group of white males any differently than the claims of those officers who were retained while white males hired at an earlier time were laid off. Thus, the FOP agrees with the district court that the order dissolving the permanent injunction disposed of the only issue in the case. Taken as a whole, the seniority system was bona fide and Stotts controls entirely, in this view of the case. The United States appears to recognize that the ranking of same-day hires presents a separate issue, but takes the position that this court need not determine the effect of the same-day rankings on the validity of the seniority system in this appeal. Since the district court injunction clearly required the layoff of some white male police officers who had longer service than some of the black and female officers who kept their jobs by reason of the injunction, the district court properly dissolved the injunction. Stotts required this action, and it was within the discretion of the district court to determine that any issue related to the same-day hires should be litigated in a separate lawsuit.
 
 IV.
 A.
 
 28
 Ohio law provides, "[w]hen it becomes necessary in a police or fire department, through lack of work or funds ... to reduce the force in such department, the youngest employee in point of service shall be first laid off." Ohio Revised Code (ORC) Sec. 124.37 (Page 1984). This is a statement which conforms to the "core concept" of seniority. California Brewers at 606, 100 S.Ct. at 819. The question is whether the locally bargained rule which the CPD applied in the case of officers hired the same day, ranking them according to composite scores, is merely a necessary appendage to the seniority system and thus covered by Sec. 703(h). Though the Court in California Brewers approved a broad application of Sec. 703(h), it cautioned against extending its reach too far:
 
 
 29
 What has been said does not mean that Sec. 703(h) is to be given a scope that risks swallowing up Title VII's otherwise broad prohibition of "practices, procedures, or tests" that disproportionately affect members of those groups that the Act protects. Significant freedom must be afforded employers and unions to create differing seniority systems. But that freedom must not be allowed to sweep within the ambit of Sec. 703(h) employment rules that depart fundamentally from commonly accepted notions concerning the acceptable contours of a seniority system, simply because those rules are dubbed "seniority" provisions or have some nexus to an arrangement that concededly operates on the basis of seniority.
 
 
 30
 Id. at 608, 100 S.Ct. at 820-21.
 
 B.
 
 31
 We conclude that the CPD operated under a bona fide seniority system. However, we further conclude that the rule by which officers hired the same day were ranked for purposes of layoff on the basis of composite scores was not an essential part of the seniority system. It was not an "ancillary" rule which was necessary for the seniority system "to work at all," California Brewers at 607, 100 S.Ct. at 820, nor did it embody the time-related "core concept" of seniority. Id. at 606, 100 S.Ct. at 819. Rather, it was an appendage to the seniority system which, while not affecting the validity of the basic last-hired, first-fired rule, was not itself an integral part of the system. This rule was similar to those described by Justice Stewart where job rights were determined by a mix of seniority and other factors. "That the 'seniority' aspect of such a scheme ... might be covered by Sec. 703(h) does not mean that the [non-seniority] requirements would also be covered." California Brewers, at 606 n. 13, 100 S.Ct. at 819 n. 13.
 
 
 32
 The FOP argues that the intervenor-plaintiffs stipulated to the validity of the examinations which formed part of the composite scores of the same-day hires and there is no issue to be decided on remand. The stipulation relied upon stated that 61 new sworn police officers were hired on July 5, 1981 as a result of the validated civil service result list posted by the civil service commission on June 17, 1981. The stipulation did not refer to examinations; it referred only to the "result list." In the same set of stipulations the intervenor-plaintiffs required the word "validated" to be struck from references to entrance examinations and promotional examinations. This issue was not foreclosed by stipulation.
 
 C.
 
 33
 The district court was required by Stotts to dissolve the permanent injunction which had directed that white male officers be laid off though they had greater seniority based on length of service than black and female officers who were retained. However, the district court erred in ordering the entire case closed and not addressing the issue raised by black and female officers laid off on the basis of composite scores while white male officers hired on the same date were retained. This issue was raised by the appellants when they intervened, and was properly before the district court. This was a "non-seniority" aspect of the collectively bargained rule pertaining to layoffs which was not covered by Sec. 703(h). Stotts did not control this issue. On remand the district court will permit the parties to develop this issue and then the court must determine whether selection of black and female officers for layoff on the basis of the composite scores violated Title VII. See Association Against Discrimination in Employment v. City of Bridgeport, 647 F.2d 256, 272-74 (2d Cir.1981). It is still open to individual officers who have been injured by this method of determining layoffs to show that they have suffered discrimination, not merely by reason of their membership in a disadvantaged class, but because they are actual victims of discrimination. Stotts, 104 S.Ct. at 2588. There is no reason to require these intervenors, already parties to this action, to proceed individually in separate actions to attempt to prove their claims.
 
 D.
 
 34
 Believing that Stotts settled all issues in favor of the defendants, the district court concluded that the intervenor-plaintiffs were not "prevailing parties," reversed its previous order (allowing attorney fees and entered an order) denying all requests for attorney fees. In view of our conclusion that one issue in this case was not covered by Stotts and required further proceedings, it is still possible that the intervenor-plaintiffs may prevail, at least in part. Thus, the question of attorney fees must be reexamined by the district court at the conclusion of all proceedings.
 
 
 35
 That portion of the district court judgment which dissolved the permanent injunction is affirmed. The order denying attorney fees and the order denying the motion to compel discovery are vacated for further proceedings. The order closing the case is reversed. The intervenor-plaintiffs will recover their costs on appeal.
 
 
 36
 COHN, District Judge, dissenting in part. I agree with the majority opinion except as to Part IV.D. As I read the record the district court failed to consider whether the intervenor-plaintiffs prevailed in part by effectively enjoining the 1983 layoffs so that they continued working until May 1984. On remand I would require the district court to deal meaningfully with this issue. See Johnston v. Jago, 691 F.2d 283 (6th Cir. 1983) and Williams v. Alioto, 625 F.2d 845 (9th Cir. 1980).
 
 
 
 *
 The Honorable Avern Cohn, Judge, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [11]
 Lower courts have uniformly held that relief for actual victims does not extend to bumping employees previously occupying jobs. See e.g., Patterson v. American Tobacco Co., 535 F.2d 257, 267 (CA4), cert. denied, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976); Local 189, United Papermakers and Paperworkers v. United States, 416 F.2d 980, 988 (CA5 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970)
 
 
 [13]
 A collective-bargaining agreement could, for instance, provide that transfers and promotions are to be determined by a mix of seniority and other factors, such as aptitude tests and height requirements. That the "seniority" aspects of such a scheme of transfer and promotion might be covered by Sec. 703(h) does not mean that the aptitude tests or the height requirements would also be so covered