Tilford YOUNGBLOOD, Ralph Nichols, individually and on behalf of the plaintiff class; Timothy Calloway, Richard Andre Curry, Johnny Dudley, Roderick Hines, Vernon Simpson, Gregory Tye, et al., Plaintiffs–Appellants,

Ohio Civil Rights Commission, Intervenor,

v.

John DALZELL, Harold Latimer, Arthur Hull, members Cincinnati Civil Service Commission; William Clarke, Director, City of Cincinnati Department of Personnel; Henry J. Sandman, Director City of Cincinnati Department of Safety; Bert A. Lugannani, Fire Chief, City of Cincinnati, Division of Fire, Defendants–Appellees,

Firefighters Union, Local 48, Intervenor–Appellee.

No. 89–3141.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 7, 1989.

Decided Feb. 14, 1991.

Alphonse A. Gerhardstein, John E. Schrider, Jr. (argued), Legal Aid Society of Cincinnati, Clarence D. Williams, III, Marc D. Mezibov, Sirkin, Pinales, Mezibov & Schwartz, Cincinnati, Ohio, for plaintiffs-appellants.

Michael A. Esposito, Asst. Atty. Gen., Columbus, Ohio, for intervenor.

Rodney Prince, Mark C. Vollman (argued), Cincinnati, Ohio, for defendants-appellees.

James W. Hengelbrok (argued), Cincinnati, Ohio, for intervenor-appellee.

Before MILBURN and BOGGS, Circuit Judges, and ENGEL, Senior Circuit Judge.

ENGEL, Senior Circuit Judge.

Plaintiffs Youngblood and Nichols are two representatives of a class consisting of black applicants for employment with and black employees of the City of Cincinnati Department of Safety, Division of Fire. Several other individual applicants also appeal from the district court's order terminating its jurisdiction over the enforcement of the consent decree entered in 1974 in settlement of a racial discrimination action. Although sympathetic to the district court's concern that the case not remain open indefinitely, we hold that the district court's order did not adequately address the specific terms of the consent decree governing closure of the case. We also hold that the district court improperly closed the case without addressing the plaintiffs' pending motion for enforcement.

## I.

In 1973, the Cincinnati fire fighter force was only 0.5% black, far short of the percentage of blacks in the local population. In that year, two blacks who had unsuccessfully applied for the position of firefighter recruit filed this race discrimination suit against various officials of the City of Cincinnati. The suit was settled by a consent decree on May 7, 1974. On January 5, 1989, the district court entered an order, *sua sponte*, closing the case and terminating its jurisdiction over the enforcement of the consent decree.

At the outset, the defendants denied engaging in racial discrimination but acknowledged that past practices might have given rise to "an inference of a pattern or practice of discrimination" against minorities. The decree referred to steps already taken to avoid such an inference and provided for additional measures to be taken for this purpose. The decree first generally enjoined the defendants from discriminating against blacks in recruitment, testing, hiring, and promotion. More specifically, the decree required the defendants to undertake various recruitment efforts aimed at blacks. The defendants were restricted to certain hiring standards, practices and procedures and specifically barred from

others, such as inquiries related to arrest records of applicants and written examinations which had a disparate impact on blacks. Particularly significant in this appeal is paragraph 22 which provides:

> 22. Subject to the availability of qualified applicants, Defendants shall adopt and seek to achieve a goal of hiring significant numbers of minority persons to achieve a workforce composition which will not support any inference of racial discrimination in hiring. Such goals shall be deemed to have been achieved when at least eighteen (18) percent of the Division of Fire personnel of the City of Cincinnati are minority persons. In order to reach this goal, Defendants shall adopt and seek to achieve a goal of hiring sufficient minority persons so that the personnel in the Division of Fire will be ... 18% Minority by December 31, 1980.

With regard to promotions, the consent decree provides simply that the Defendants "shall use a system for promoting qualified ... [black firefighters] to achieve a goal of a work force composition which negates any inference of an unlawfully discriminatory promotion policy based on race."

Paragraph 34 of the consent decree provides for continuing jurisdiction of the court.

> The Court will retain continuing jurisdiction of this action for such further relief or other orders as may be appropriate pending a showing of compliance with the terms of this Decree. Upon a showing of good cause, and upon due notice to all parties, or upon agreement of the parties, any provision of this Decree may be amended or modified by an order of this Court or any Court of competent jurisdiction. At any time after the objectives of this Decree have been achieved, the Defendants may move this Court, on due notice, for dissolution of the Decree.

By the end of 1980, blacks comprised 9.6% of the City's firefighters, substantially shy of the 18% goal set by the consent decree for that date. Consequently, in 1981 the parties obtained the court's approval to reset the 18% goal to the end of 1985 at the latest. However, the 18% goal was not met until December 31, 1986. At the time of the district court's order closing the case the Fire Division was 20% black.

## II.

The instant appeal arises from the trial judge's *sua sponte* dismissal of the action and from the plaintiffs' joint Motion to Enforce the Consent Decree and Motion to Modify the Decree, filed in December 1987. The Motion to Enforce alleges several violations of the consent decree. First, the plaintiffs contended that the defendants' 1986–87 firefighter hiring process directly violated the consent decree by inquiring into the arrest records of the applicants and their relatives, and by eliminating disproportionate numbers of blacks to whites from the general applicant pool based on subjectively evaluated or irrelevant criteria. The plaintiffs further charged that the defendants violated the consent decree at a subsequent stage of the hiring process by continuing to use the same forbidden information regarding arrest records, and by eliminating disproportionate numbers of blacks at this stage as well, albeit within a separate, all-black eligibility list. The plaintiffs also noted that white applicants with unfavorable information in their files similar to that of eliminated blacks were hired from the white eligibility list. The Motion to Enforce therefore requested the district court to order the defendants to hire several individual class members who were eliminated at either the general pool or separate eligibility list stages in 1986–87.

The Motion to Enforce also alleged ongoing violations of the consent decree in the 1988 hiring process then underway. Specifically, the plaintiffs accused the defendants of continuing to seek information about applicants' arrest records, and of inadequately supporting and actively impeding the black recruitment program mandated by the consent decree.

The final violation of the consent decree alleged in the Motion to Enforce was that the defendants had failed to achieve the

18% hiring goal by the 1985 amended deadline. In an accompanying Motion to Modify, the plaintiffs requested the court to amend the consent decree to establish a new black representation goal and timetable.

A further violation of the consent decree advanced by the plaintiffs at the hearing on their Motion to Enforce but not included in the Motion itself was that the defendants had hired several white applicants without putting them through the full screening process. These applicants had sought to intervene in the case in August 1987, claiming reverse discrimination. The defendants settled the claim by hiring the prospective intervenors, with the district court's approval. However, the court stated that whether the defendants had discriminated against black applicants by not screening the intervenors completely would be addressed in any subsequent ruling on the plaintiffs' pending Motion to Enforce.

After the plaintiffs filed their Motion to Enforce, the defendants deleted the question asking for arrest records from the 1988 applicant questionnaire, but denied the other alleged violations of the consent decree. The district court, through Judge Porter, scheduled an evidentiary hearing on September 16, 1988 concerning the claims of the individual class members who were denied employment in 1986–87. Judge Porter subsequently withdrew from the case because of ill health, and the case was transferred to the docket of then Chief Judge Rubin. Soon after, Judge Rubin held an in-camera status conference with the parties[1] to discuss the pending Motion to Enforce. At the conference, the judge apparently raised the question whether continuing jurisdiction over the case should be terminated.

On November 3, 1988, the court held a hearing on the pending motions. After considering the intervention motion, the court again queried and heard extensive arguments on whether its supervision of the case should be terminated. The plaintiffs also presented evidence of violations of the consent decree in the 1986–87 and 1988 hiring processes and requested the court to reschedule the evidentiary hearing originally set for September. The following day, the plaintiffs submitted a memorandum on the court's proposal to close the case.

In an order dated January 5, 1989, the district court terminated its oversight of and closed the case. *Youngblood v. Dalzell*, 704 F.Supp. 137 (S.D.Ohio 1989). In an order issued the same day denying the white applicants' Motion to Intervene, the court stated that the "Consent Decree is still in full force and effect and governs the actions of defendant City of Cincinnati." Order Denying Motion to Intervene at 2.[2]

On appeal in the present case, the plaintiffs argue that the court erred in closing the case while plaintiffs' Motion to Enforce was pending and while the goals of the consent decree remain unmet. The plaintiffs also argue that the court erred in closing the case without giving them an opportunity to seek attorney fees based on their alleged partial success on the Motion regarding the 1988 applicant questionnaire.

### III.

A key provision of the consent decree in this case is paragraph 34, governing continuing jurisdiction of the court and duration of the consent decree. That paragraph provides that the court's jurisdiction over the case may be terminated when the

---

**1.** This included Firefighters Union Local 48, which had been granted intervenor status limited to issues of specific interest to its members, such as promotion. Also present were a new group of white applicants who alleged reverse discrimination and had moved to intervene.

**2.** After the court closed the case, five of the six class members seeking relief through the Motion to Enforce initiated a new action on their individual claims. *Tye, et al. v. City of Cincin-*

nati, No. C–1–89–124 (S.D.Ohio, filed Feb. 17, 1989). This action is presently pending. The white applicants denied intervention also initiated a new action, *Jansen, et al. v. City of Cincinnati*, No. C–1–89–079 (S.D.Ohio, filed Feb. 2, 1989). This action too is pending. This court recently reversed the district court's denial of a motion to intervene in *Jansen* by the plaintiff class in the present case. *Jansen v. City of Cincinnati*, 904 F.2d 336 (6th Cir.1990).

defendants are shown to be in "compliance with [its] terms," and that the decree may be dissolved "after the objectives of this Decree have been achieved." Relevant to the former clause, this circuit has held that a district court may not close a case governed by a consent decree without addressing pending claims that the defendants have violated the decree. *United States v. City of Cincinnati*, 771 F.2d 161, 168–69 (6th Cir.1985). Relevant to the latter clause, the Supreme Court has held in the school desegregation context that where the defendant school district has achieved one of the objectives of a multi-faceted desegregation order, the district court's remedial authority with regard to that aspect of the school system is at an end and that part of the injunction must be dissolved. *Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 436–37, 440, 96 S.Ct. 2697, 2704–05, 2706, 49 L.Ed.2d 599 (1976).

In closing the present case, the district court did not explicitly address the governing standards in paragraph 34. Rather, the court stated that the imbalance of minority hiring had been "corrected" and that "[t]he problems that were originally presented to [this court] have been solved." 704 F.Supp. at 138, 139. It is apparent from the context of these statements and from the court's remarks at the November 3 hearing that the court was here referring to the fact that black representation in the Fire Division has surpassed the original 18% figure established in the consent decree. *See* 704 F.Supp. at 139; Trans. at 52, 73, 82. The district court concluded that closure of the case was therefore mandated by the Supreme Court's decisions in *Spangler* and *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The district court did not discuss the plaintiffs' pending motion to enforce nor this circuit's decision in *City of Cincinnati*.

The district court's disposition of the case is troublesome in light of *City of Cincinnati*. The consent decree in that case, a Title VII enforcement action, was designed to increase the representation of blacks and women in a municipal police department. To enforce the consent decree, the district court had issued an injunc-

tion ordering that white male officers be laid off instead of black and female officers with less seniority. Upon remand in light of an intervening Supreme Court decision, the district court dissolved the injunction as invalid under the new precedent. However, the court proceeded to close the case without addressing an allegation by several intervenor-plaintiffs that the defendant had discriminated against them in violation of the consent decree by laying them off while retaining white male officers with equal seniority. Instead, the court stated that the complaining officers were free to commence a new action. Our court reversed. Because the intervenor-plaintiffs' allegation presented a separate issue from layoffs by seniority, we held that the district court erred by closing the case without addressing the claimed violation of the consent decree. Remanding the case, we stated:

> It is still open to individual officers who have been injured by [the test score] method of determining layoffs to show that they have suffered discrimination, not merely by reason of their membership in a disadvantaged class, but because they are actual victims of discrimination. There is no reason to require these [plaintiff-]intervenors, already parties to this action, to proceed individually in separate actions to attempt to prove their claims.

771 F.2d at 168–69 (citation omitted).

In this case, the plaintiffs claimed before the court at the November 3 hearing and in the prehearing briefs that the defendants had violated the terms of the consent decree in various respects. Like the district judge who originally presided over the case before it was transferred, Judge Rubin at the hearing stated that he would address the alleged violations in his ruling. Yet the opinion below closed the case without mentioning any of the alleged violations. Under *City of Cincinnati*, this disposition seems precipitous at best.

It appears from the transcript of the November 3 hearing that the district court took a dim view of most of the alleged violations of the consent decree. The court

repeatedly observed that the individual claims of disparate treatment fell beyond the scope of the class action consent decree, which focuses only on disparate treatment of blacks as a class. This reasoning seems sound at least as far as the eliminations from the all-black eligibility list are concerned. Other claims remain unanswered, however, including the charge that the defendants improperly eliminated blacks from the general applicant pool and hired the white prospective intervenors in 1987 without subjecting them to the full screening process. The record before us is not well-developed on these points. This fact, the complexity of the case and the uncertain scope of the consent decree make us reluctant to rule on the Motion to Enforce initially on appeal. We accordingly leave this task to the district court on remand.[3]

Also pending before the district court at the time of its ruling was the plaintiffs' Motion to Amend the consent decree. The order closing the case gives no response to this request as well. It should be noted that at the hearing below, this motion apparently was discussed little if at all. Further, counsel for the plaintiffs at oral argument on appeal intimated that they no longer seek to amend the 18% representation figure. This uncertainty suggests that the status of the Motion to Amend should be initially resolved on remand as well.

Once the district court has formally ruled on the pending motions, it may then properly consider whether its jurisdiction over the case may be terminated. However, we are troubled by more than just the prematurity of the district court's decision here and express these concerns in the interests of clarifying the district court's task on remand. Although paragraph 34 of the consent decree plainly sets a standard to govern termination of judicial supervision, the opinion below relied instead upon the Supreme Court's decision in *Spangler*. Upon closer analysis, this reliance appears misplaced. The issue in *Spangler* was whether an injunction issued following a finding of a constitutional violation should be partially dissolved. *See* 427 U.S. at 427–28, 431, 440–41, 96 S.Ct. at 2700–01, 2702, 2706–07. The Court in *Spangler* held that when the injunctive order's goal of a racial-

---

**3.** If the district court were to conclude on remand that the individual class members' claims are outside the scope of the class action, the plaintiffs contend that such a ruling would be unfair. Shortly after the district court closed the present case on January 5, 1989, the individual claimants commenced a separate action, *Tye v. City of Cincinnati,* No. C–1–89–124 (S.D.Ohio, filed Feb. 17, 1989), on their claims of discrimination. The *Tye* plaintiffs now face a statute of limitations defense. If that suit is based on section 1983, the applicable statute of limitations is two years. *Browning v. Pendleton,* 869 F.2d 989 (6th Cir.1989) (en banc). Assuming that the limitations period on the alleged discrimination in the 1986–87 hiring began to run before February 17, 1987 and was not subject to tolling, the period would have expired while the Motion to Enforce, filed December 14, 1987, was pending. The plaintiffs in this appeal seek protection from this potential result of the refusal by the district court to rule on the merits of their Motion to Enforce and a statute of limitations dismissal in *Tye.*

Initially, it should be noted that the plaintiffs have not discussed whether the two assumptions above are valid, and particularly whether the limitations period in *Tye* would be subject to equitable tolling under precedent such as *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 94

S.Ct. 756, 38 L.Ed.2d 713 (1974) (commencement of a class action tolls the limitations period for every member of the alleged class at least until the court decides whether to certify the class), and *Fox v. Eaton Corp.,* 615 F.2d 716, 719–20 (6th Cir.1980) (filing an action in a court which does not clearly lack jurisdiction tolls the limitations period). Wholly aside from the merits of the statute of limitations issue, however, that question is more properly resolved in *Tye* and any subsequent appeal to this court, and not in the present case.

The plaintiffs also urge that not to consider the individual discrimination claims in this case would be unfair because until the Supreme Court's decision in *Martin v. Wilks,* 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989), Sixth Circuit precedent barred a separate action on the claims. *Martin* rejected the "impermissible collateral attack doctrine" adopted by most of the circuits, including the Sixth. 109 S.Ct. at 2185 & n. 3, 2186. *See Striff v. Mason,* 849 F.2d 240 (6th Cir.1988) (legal actions which constitute collateral attacks on consent decrees in civil rights cases are not permitted); *Stotts v. Memphis Fire Dep't.,* 679 F.2d 541, 558 (6th Cir.1982) (same), *rev'd on other grounds sub nom. Firefighters Union Local 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). Again, however, this matter is properly resolved in *Tye* and not here.

ly neutral system of student assignment had been achieved, the injunction should have been modified or partially dissolved to remove any continuing instrumental obligations on the school district in this regard. 427 U.S. at 434–35, 436–37, 96 S.Ct. at 2703–04, 2704–05. While *Spangler's* general warning against overstepping the bounds of judicial authority is certainly to be heeded, it does not seem directly applicable to the present litigation for in that case it was undisputed that the defendant school district had accomplished the relevant objective of the district court's order.[4] *See* 427 U.S. at 431, 96 S.Ct. at 2702.

Here, however, the parties disagree on whether the defendants were in compliance with the "terms" of the consent decree, and thus whether the court's ongoing jurisdiction should terminate. In response, the court declared that the "objectives" of the consent decree had been achieved. Several problems flow from this statement. First, this conclusion presumes that the 18% figure of paragraph 22 is an immutable and fundamental hiring objective of the decree rather than an obsolete proxy for a fairly representative work force, arguably the true hiring objective of the decree. This reading of paragraph 22 is better explained rather than presumed, particularly if the plaintiffs still seek to increase the 18% figure. Second, if the 18% figure is held to be an objective not dependent on any particular deadline, its achievement would suggest that that portion of the consent decree might now be *dissolved*, under the direct authority of paragraph 34 and the indirect authority of *Spangler*. The district court's order itself suggests this result. *See* 704 F.Supp. at 139 ("The problems that were originally presented to the [district court] have been solved."). Yet the district court repeatedly emphasized that the consent decree remains in full effect. The plaintiffs'

confusion here is thus understandable. Third, in stating that the objectives of the consent decree have been met, the district court apparently referred only to the hiring requirements. Yet the consent decree also sets goals and means to achieve them with regard to the recruitment and testing of firefighter applicants and the promotion of current firefighters. *See* Decree ¶¶ 10–11, 15–20, 27.

The Supreme Court's recent ruling in *Board of Educ. of Okla. City Public Schools v. Dowell,* —— U.S. ——, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991), offers guidance in determining when judicial supervision of consent decrees may be terminated. The Court held that the proper standard for deciding whether a school desegregation decree should be dissolved is whether the purposes of the desegregation litigation, as incorporated in the decree, have been fully achieved. 111 S.Ct. at 636–37. The Court remanded the matter to the district court for a determination whether the terms of the decree had been met by the defendant school board.

■ Similarly, on remand, the district court here, after ruling on the pending motions, should consider whether to terminate its jurisdiction over the case in light of the specific terms of the consent decree. The record in this case establishes that the 18 percent minority hiring goal has been achieved, but not within the timetable set forth in the decree. As a result, the district court must also consider the more general goals of the decree which the terms were designed to accomplish. As noted above, the specific hiring criterion established in the decree 17 years ago reflected not an immutable standard, but rather was designed to achieve a "workforce composition which will not support

---

4. The same can be said of *Bell v. Wolfish,* also cited in the opinion below. There, the Supreme Court stated in dicta that the role of federal courts in suits challenging prison conditions is "limited to the issue of whether a particular system violates any prohibition of the Constitution or ... a statute." 441 U.S. at 562, 99 S.Ct. at 1886. The Court emphasized that judges should resist the temptation to substitute their own solutions to complex prison administration problems for the solutions of those with expertise and the constitutional authority in the first instance. *Id.* While compelling, these admonitions do not resolve the issue here of whether the defendants have complied with the terms of the consent decree and thereby removed the need for continued judicial supervision.

any inference of racial discrimination in hiring." (Consent decree parag. 22).

If the district court determines that in spite of the defendants' failure to achieve the specific terms of the consent decree in a timely fashion, the goal which the 18 percent requirement sought to achieve— the eradication of discriminatory hiring— has been achieved, then the court may dissolve that portion of the decree. In making this determination, the court must consider the argument in the plaintiffs' Motion to Modify that in the years since 1974, the racial composition of the City's workforce has so changed that the 18 percent minority hiring goal no longer is sufficient to dispel the inference that the City's hiring practices are discriminatory. Paragraph 34 of the consent decree allows the court to modify or amend the terms of the decree, and under *City of Cincinnati* the court's failure to consider such arguments would be erroneous. We emphasize again that this probing of the underlying goal of the decree is necessary before the decree is dissolved because, unlike the situation in *Spangler*, where all parties agreed that the express terms of the district court's order had been met, here the specific terms of the decree were not achieved by the deadline in the agreement, and other allegations of non-compliance have been raised. Obviously the court cannot now turn back the clock and ensure that the 18 percent hiring goal is achieved at a date long since past. As a result, the district court must look beyond the numerical term to the goal which that hiring requirement was designed to achieve. In deciding whether to close the case and dissolve the decree in its entirety, the district court must similarly consider the goal of negating any inferences of unlawful discrimination in the recruitment, testing and promotion of minorities since in these areas, no specific numerical terms were established by the consent decree.

Before the district court dissolves the decree, it must determine that the goals of the consent decree have been achieved and must consider all objections to such dissolution. In weighing the possibility of dissolving the decree, the district court may properly consider the length of time over which this particular decree has been in effect and the continuing efficacy of its enforcement. Undoubtedly the demographics of the City have changed, the original parties to the 1974 decree may well have moved on to other careers, and undeniably many of the original concerns regarding hiring and promotion in the Cincinnati fire department have been resolved, albeit not as quickly as the original decree envisioned. If the district court determines that the goals of this decree have been achieved, the court is not required to leave the decree in force indefinitely, particularly where as here there has been little legal activity concerning the decree in recent years, and litigation is now pending which raises more current concerns about the state of race relations in the City's public safety departments. As the Supreme Court has said in the context of school desegregation decrees designed to remedy past discrimination, "[s]uch decrees ... are not intended to operate in perpetuity." *Dowell,* 111 S.Ct. at 637.

While the commitment of the court to the principles of equal opportunity in hiring and promotion remains firm, as does our determination that this decree not be dissolved before its goals are met, we recognize that further modification of the decree to remedy racial problems that remain may not offer the best solution to any ongoing concerns that today's victims of discrimination may voice. Those claims are perhaps best addressed in the pending litigation in the *Tye* and *Jansen* cases filed with the district court. The concerns originally voiced in the decree may yet remain, and we leave to the district court the task of determining whether further modification of the decree is warranted to achieve the decree's important initial goals. Yet our interest in seeing that the decree is not dissolved prematurely is coupled with a realization that not every wrong in the Cincinnati fire department can be righted by a decree which is now 17 years old, and the district court may find that other pend-

ing litigation offers a better vehicle for addressing any alleged legal wrongs in the City's policies today once those initial goals have been achieved.[5]

The plaintiffs' final objection against the district court's order closing the case is that closure prevented them from seeking attorneys' fees for the claimed partial success of their original Motion to Enforce. The plaintiffs contend that the Motion prompted the defendants to reform certain features of their hiring and promotion practices to bring them into compliance with the consent decree. On remand it would seem appropriate to consider a motion for attorney fees, if timely.[6]

For the reasons discussed above, we REMAND this case to the district court for formal disposition of all pending motions and for reconsideration of whether the court may terminate its jurisdiction over the case.

---

5. We further note that the plaintiffs have argued on appeal that ¶ 8 of the consent decree, which permanently enjoins the Fire Division from "any act or practice which has the purpose or effect of wrongfully discriminating" against any black applicant or employee, further justifies keeping the case open. In reconsidering the termination of jurisdiction issue on remand, it may be necessary to address to what extent this injunction imposes any unique obligations on the defendants, particularly in light of the defendants' disclaimer of any prior constitutional violations in ¶¶ 5–6. *See Keyes v. Denver School Dist. No. 1,* 895 F.2d 659, 668–69 (10th Cir.1990) (holding that a certain paragraph in a post-judgment desegregation decree "does no more than require the [defendant] to obey the law, and therefore must be stricken"), *pet. for cert. pending,* No. 89–1698, 59 U.S.L.W. 3014 (July 17, 1990).

6. Relevant to this point is the plaintiffs' general objection on appeal that the district court closed the case *sua sponte* without adequate notice. The district court did raise the issue before all the parties at the status conference held in mid-September, but for unknown reasons the closure issue was not briefed to the court until the day after the hearing. Although the court solicited arguments on the issue at the hearing, it would seem that the district court should have issued a pre-hearing Order to Show Cause to allow the parties adequate prior notice and opportunity to research and brief the issue fully. Such an order also would have warned the plaintiffs to file any motions for attorney fees immediately. *Cf. Pitts v. Freeman,* 755 F.2d 1423, 1426 (11th Cir.1985) (a school desegregation case may not be closed without a hearing on the issue, and the plaintiffs should receive notice of the hearing's purpose).