**Timothy JANSEN, et al., Plaintiffs,**

**v.**

**CITY OF CINCINNATI, Defendants.**

**Civ. Nos. C–1–89–079, C–1–89–479 and C–1–90–151.**

United States District Court, S.D. Ohio, W.D.

March 18, 1991.

William Wyler, John Schrider, Jr., Alphonse Gerhardstein, Cincinnati, Ohio, for plaintiffs.

Mark Vollman, Julie Bissinger, Cincinnati, Ohio, for defendants.

## ORDER

CARL B. RUBIN, District Judge.

This matter is before the Court on cross-motions for summary judgment the determination of which will by agreement of counsel be dispositive of the issues in this matter. Plaintiffs assert that a Consent Decree entered into in 1974 has by its operation denied them rights conferred by the laws of the State of Ohio. In accordance with Rule 52, Fed.R.Civ.P., the Court does hereby set forth its Findings of Fact, Opinion and Conclusions of Law.

### I. FINDINGS OF FACT

1. There is no factual dispute between the parties and the following recitation of facts is intended more for background than any judicial determination by the Court.

On May 7, 1974, in the case of *Tilford Youngblood v. John Dalzell*, Civil No. 8774, parties entered into a Consent Decree determining hiring and promotions in the City of Cincinnati Fire Division.

2. Of significance to the matter before the Court are the following:

A. Consent Decree, paragraph 22: "Subject to the availability of qualified applicants, defendant shall adopt and seek to achieve a goal of hiring sufficient numbers of qualified minority persons to achieve a work force composition which will not support any inference of racial discrimination in hiring. *Such goal shall be deemed to have been achieved when at least eighteen percent (18%) of the Division of Fire Personnel of the City of Cincinnati are minority persons.*" (Emphasis added)

Paragraph 22 continues by assigning numerical percentages and dates by which those percentages should be achieved. From a minimum of 4.2% by December 31, 1974, the "goal" proceeds to a maximum of 18% by December 31, 1980.

B. Paragraph 23 of the Consent Decree contains the following language:

"Defendant shall be deemed to have sought to achieve each stage of the work force composition goals when and as the above percentages of Fire Division Personnel are minority persons ... defendants shall be deemed to have sought to achieve each stage of the work composition goals *in good faith* if at least forty percent (40%) of the total fire recruit class for any given year consists of minority persons." (Emphasis added).

C. Ohio Revised Code § 124.26 enjoins upon the Civil Service Commission the following obligation: "... [it] shall prepare an eligible list ... of such persons [who] shall take rank upon the eligible list as candidates in the order of their relative excellence as determined by the examination ..."

D. Ohio Revised Code § 124.27 requires the Civil Service Commission to "certify to the appointing authority the names and addresses of the three candidates standing highest on the eligible list for the class or grade to which the position belongs; ... the appointing authority shall notify the director of such position to be filled and he shall fill such position by appointing one of the three persons certified to him." [1]

3. The plaintiffs took an examination on January 30, 1988, for appointment to the Fire Division of the City of Cincinnati. Following grading of the examinations, the defendants proceeded in the following fashion:

A. Two lists of eligible persons were prepared: one known as the Fire Recruit Majority List for nonblack fire recruit candidates; and the other referred to as the Fire Recruit Minority List for black fire recruit candidates.

B. In advance of such examination defendants determined that 40% of the class would be taken from the Minority List and 60% would be taken from the Majority List.

4. The plaintiffs were all included in the Fire Recruit Majority List and none were appointed. Examinees on the Minority List who had scores below those of plaintiffs were appointed.

5. Since December 31, 1986, the staffing level of the Fire Division has consisted of 18% or more minority individuals.

## II. OPINION

### A. Introduction

Any consideration of the problem presented herein must begin with an understanding of Civil Service. In the 1880's a society weary of public jobs filled by patronage and fed up with the adage: "To the victor belongs the spoils," gave sufficient support to the concept of Civil Service that Congress did in 1883 pass the first Civil Service bill. It was known as the Pendleton Act. It was named in honor of George Hunt Pendleton, a senator who resided in Cincinnati.

Civil Service began in the City of Cincinnati shortly before the outbreak of World War I. It became a basic part of city government in Article V of the City Charter adopted in 1926. Civil Service is based upon a simple concept: The public is entitled to the most qualified person in every appointive public job. The critical word is "qualified" and that term has been altered from time to time. Both the General As-

1. This provision is sometimes referred to as "The Rule of Three."

sembly of Ohio and the courts have varied that term as the needs of society have required. Shortly after WWI a determination was made that those persons who had served in the military service were entitled to assistance in the awarding of Civil Service jobs. Such persons were given additional credit on passing scores [2]. This credit is known as "Veterans Preference," and did affect the definition of "qualified." There is nothing wrong with Veterans Preference. It is a legislative response to a perceived need by society in order properly to assist those people who had served their country in the military. It does, however, tend to penalize women in those situations where they compete with male veterans for appointment. In the absence of a universal draft, far fewer women have served in the military. The reference herein to Veterans Preference is merely to demonstrate that society, through its elected representatives, may change Civil Service concepts.

█ Such concepts may also be changed by a judicial response. Within the past 25 years society has perceived an unfair aspect of Civil Service as it affects blacks. The judicial solution was the application of "Affirmative Action". Minority persons were assisted in obtaining jobs under Civil Service, by further defining the word "qualified." In the matter at hand Affirmative Action was accomplished by the Consent Decree. Such Decrees have served a useful purpose. They are an accepted method and they have been approved by appellate courts. The Consent Decree herein was specifically approved by the United States Court of Appeals for the Sixth Circuit in *Youngblood v. Dalzell*, 568 F.2d 506 (6th Cir.1978).

However one describes the need and the merits of Consent Decrees, they should not be unlimited and open ended. They embody the immutable logic referred to in the following quotation from *Alice in Wonderland:* "The more there is of mine, the less there is of yours." [3] With a limited number of jobs available, the selection of any

applicant contrary to Ohio Civil Service law will require the penalizing of someone else.

### B. *The Consent Decree*

█ The Consent Decree in this matter is almost fifteen years old. A consideration of it requires a careful examination of paragraphs 22 and 23 (Findings of Fact 2A and 2B). A distinction must be drawn between them. Paragraph 22 sets forth in specific terms the "goal" that the Consent Decree sought to achieve. That goal required 18% of the Division of Fire Personnel of the City of Cincinnati to be minority persons by December 31, 1980. It is irrelevant to this inquiry whether or not the goal was reached by that date. The critical date herein is August 7, 1988, when plaintiffs sat for the examination. On that date the goal had been reached.

Paragraph 23 does not set forth goals, it deals instead with a test for the good faith of defendant. The Court will take judicial notice that not all persons who apply are selected for a fire recruit class. Arguably, such persons could be rejected for discriminatory reasons and the goal of paragraph 22 never reached.

Paragraph 23 is what it appears to be. It sets forth an empirical standard whereby the good faith of the City of Cincinnati could be measured. It also protects the City against penalty if matters beyond its control prevented the achieving of the levels set forth in paragraph 22. The language of paragraph 23 is instructive and bears repetition. It provides in part:

> Defendants shall be deemed to have *sought* to achieve each stage of the work composition goals *in good faith* if at least forty (40) percent of the total fire recruit class for any given year consists of minority persons. (Emphasis added).

Somehow the simple English words have been construed to be an addendum to paragraph 22. If so, it is completely inconsistent with the "goal" of 18%. There is no language in the Consent Decree requiring the Fire Division at any time to consist of

---

**2.** "Veterans Preference" is currently set forth in Ohio Revised Code § 124.23.

**3.** *The Annotated Alice,* Bramhall House, 1960. Pg. 122.

40% minority persons. If the City of Cincinnati had elected in the Consent Decree or does elect in future Consent Decrees to establish that percentage, it may do so. The Fire Division may in fact reach that percentage, but under the current Consent Decree, it may not invoke judicial assistance to do so. The Court can only construe the existing Consent Decree which *in haec verbae* lists a maximum goal of 18%. There is no dispute among the parties that 18% had been achieved prior to the date on which these plaintiffs took the entrance examination.

The Court has previously noted that Consent Decrees are legal exercises of municipal power, but they should be strictly construed since they do supplant the statutory basis of Civil Service selection as set forth in Ohio Revised Code §§ 124.26 and 124.27.

Section 124.26 is particularly instructive since it imposes a mandatory duty upon a Civil Service Commission to rank the candidates "in the order of their relative excellence as determined by the examination ..." Any judicial requirement that a public official avoid his mandatory duty should be carefully examined.

### C. *Strict Scrutiny*

There is a thread that seems to run through the reported decisions of the Supreme Court on Affirmative Action that is instructive herein. Terms such as "searching examination," "strict scrutiny," and "narrowly tailored," recur with some frequency. For example, an agreement between a Board of Education and a Teachers' Union seeking to vary a lay-off policy by seniority which would impact unfavorably upon recently hired minorities was struck down by the Supreme Court in *Wygant v. Jackson Bd. of Education*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). In that case the following statement is made:

> In the context of affirmative action, racial classification must be justified by a compelling state purpose and the means

chosen by the state to effect that purpose *must be narrowly tailored*. (Emphasis added.)

In dealing with "set asides" of contracts for minorities, the Supreme Court of the United States in *City of Richmond v. J.A. Croson*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) directed that such plans be subjected to "strict scrutiny." The Court determined that the plan in that case was "not narrowly tailored" and therefore not justified.

In a previous "set aside" case *Fullilove v. Klutznick*, 448 U.S. 448 at 491, 100 S.Ct. 2758 at 2781, 65 L.Ed.2d 902 (1980), the following appears:

> Any preference based on racial or ethnic criteria must necessarily receive a most searching examination to make sure that it does not conflict with constitutional guarantees.

The Supreme Court specifically referred to a Consent Decree in *Firefighters Local Union v. Stotts*, 467 U.S. 561 at 574, 104 S.Ct. 2576 at 2585–86, 81 L.Ed.2d 483 (1984) in the following language:

> [the] "scope of a Consent Decree must be discerned from its four corners and not by reference to what might satisfy the purpose of one of the parties to it." *citing United States v. Armour & Co.*, 402 U.S. 673, 681–682, 91 S.Ct. 1752, 1757–1758, 29 L.Ed.2d 256 (1971).

### D. *Limitation*

It should be noted that the decision in this matter is a limited one. The Court finds only that the goal of the Consent Decree as it relates to hiring has been achieved. The City of Cincinnati is directed forthwith to abstain from any action to appoint fire recruits in violation of the requirements of the Civil Service laws of Ohio[4]. The Court does not find that the Consent Decree was improperly entered into or that any appointments thereunder are void. This holding does not invalidate any portion of the Consent Decree that deals with promotion since that issue is not

---

**4.** Ohio Revised Code § 124.90 provides a means whereby a city may waive, suspend, or alter the provisions of Chapter 124. Based upon advice

from counsel the Court understands that such action has never been taken in regard to the Fire Division.

involved herein. All persons who were appointed to the Fire Division and who have not been separated therefrom have valid appointments and are entitled to all rights and benefits accruing from such appointment.

### E. *Remedy*

█ The fashioning of an appropriate remedy for these plaintiffs is a difficult one. Since the Consent Decree is legal, valid and appropriate, any adverse effect upon such plaintiffs would appear to be noncompensable. The reality, however, is that the City of Cincinnati went beyond its obligations and in so doing adversely affected these plaintiffs in a limited fashion.

Under the Rule of Three, plaintiffs had no assurance of employment and should not now be employed retroactively with payments and benefits to which such employment might entitle them. The Court does direct the City of Cincinnati to "dovetail" these plaintiffs into the next list of Fire Recruits in the position their examination results would confer. Such list should be submitted to the Fire Chief for his consideration. An appointment under the Rule of Three, if any, would not be retroactive and plaintiffs would not receive seniority or benefits prior to the actual date of appointment.

█ As attorneys for a successful party in a civil rights action, plaintiffs' counsel are entitled to appropriate compensation. Such counsel are directed to submit to the Court within thirty days of the date of this Order an itemized list of time spent in order that fair compensation may be awarded.

It might appear that the City of Cincinnati has now been penalized twice. Undoubtedly, the City compensated adverse counsel who negotiated the Consent Decree. Now it appears that attorney fees will be awarded for a successful contest of that Consent Decree. The unfairness, however, is more apparent than real. The City of Cincinnati is not required to pay attorney fees for a successful contest of the Consent Decree. The Consent Decree per se has withstood such challenge and no counsel fees are payable therefor. Plaintiffs have only successfully objected to conduct beyond the Consent Decree. It is for that activity alone that the Court will award compensation. Since exceeding the Consent Decree was a voluntary act by the City of Cincinnati, it did in fact violate the civil rights of these plaintiffs.

### III. CONCLUSIONS OF LAW

A. This Court has jurisdiction pursuant to 42 U.S.C. § 1983.

B. A Consent Decree which provides for a favored treatment of minorities in order that the total employment percentage of that minority be increased is not per se invalid and represents an acceptable method of correcting a racial imbalance. *Youngblood v. Dalzell*, 804 F.2d 360 (6th Cir.1986).

C. Consent Decrees which operate to violate the Civil Service laws of Ohio must be strictly construed and not extended beyond the specific terms thereof. *Fullilove v. Klutznick*, 448 U.S. 448 at 491, 100 S.Ct. 2758 at 2781, 65 L.Ed.2d 902 (1980).

D. Where a stated percentage of minority employment has been achieved for a substantial period of time, that portion of a Consent Decree is at an end and may be terminated as to such hiring practices. *Board of Education of Oklahoma City Public Schools v. Dowell, et al.*, — U.S. ——, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991).

E. A Consent Decree which includes both hiring and promotional practices is severable and a Court may terminate the hiring practices set forth therein while not affecting the validity of the promotional aspects of such Decree.

F. Where by statute successful candidates of a hiring examination are subject to the "Rule of Three," a remedy for successful plaintiffs may only place them back on an eligible list but not require the appointing authority to waive its rights under the Rule of Three.

G. In view of the foregoing, Plaintiffs' Motion for Summary Judgment is hereby GRANTED to the extent set forth herein.

Defendants' motion for summary judgment is DENIED. Plaintiffs' counsel are entitled to appropriate compensation.

IT IS SO ORDERED.