YOUNGBLOOD, et al., Plaintiffs,

v.

DALZELL, et al., Defendants.

Civ. No. 8774.

United States District Court,
S.D. Ohio, W.D.

Oct. 31, 1991.

William Wyler, Clarence Williams, John Schrider, Cincinnati, Ohio, for plaintiffs.

Rodney Prince, Mark Vollman, Cincinnati, Ohio, for defendants.

## FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

CARL B. RUBIN, District Judge.

This matter is before the Court pursuant to remand by the United States Court of Appeals for the Sixth Circuit. 925 F.2d 954 Pursuant to such remand a hearing was held in open court on September 13, 1991. No limitation was placed on the nature of evidence and testimony to be presented. In accordance with Rule 52, Fed.R.Civ.P., the Court does hereby submit its Findings of Fact, Opinion and Conclusions of Law.

### I.

### INTRODUCTION

This litigation has pended for approximately eighteen years. It began with the filing of a law suit alleging race discrimination by the City of Cincinnati in the employment of blacks in the Cincinnati Fire Division. On May 7, 1974, the parties entered into a Consent Decree intended to settle this action. The Consent Decree imposed a burden of supervision by the United States District Court which continues to this day.

The controversy, however, is far from settled. The methods used to achieve the terms of the Consent Decree have generated at least two other law suits, *Tye, Et al. v. City of Cincinnati*, Civil No. C–1–89–124, and *Jansen, Et al. v. City of Cincinnati*, 758 F.Supp. 451. It is the assertion of Plaintiffs in *Tye* and *Jansen* that they have been discriminated against in violation of the Civil Service Laws of Ohio in order to achieve the goals set in the Consent Decree.

## II.

## FINDINGS OF FACT

1. The City of Cincinnati, in order to create eligible lists in the Fire Division, follows essentially a four step procedure. There is a written examination, a physical ability examination, a medical examination and a background inquiry. The candidates who qualify under this process are placed on eligible lists and ranked numerically in order of accomplishment. Eligible candidates also receive points under Veterans Preference as set forth in Ohio Revised Code § 124.23. Two lists are prepared in order that blacks compete only with blacks and whites compete only with whites. As a result, there are white candidates who are rejected who have higher scores than black candidates who are appointed. It is that condition that has created the *Tye* and *Jansen* suits referred to above.

2. After the two lists are compiled, the City follows the "Rule of Three" codified in Ohio Rev.Code Ann. § 124.27 with respect to each list. That provision requires the director of administrative services to "certify to the appointing authority the names and addresses of the three candidates standing highest on the eligible list for the class or grade to which the position belongs". If more than one position is to be filled, the director may certify a group of names from the eligible list. Beginning at the top of the list, the appointing authority is required to appoint one of the first three candidates on the list. A candidate who is passed over more than three times may be omitted from future certification to the appointing authority.

3. Plaintiffs have objected to the written test asserting that it is "not valid" for rank order selection. The evidence presented to the Court is to the contrary. Defendants' expert testified that based upon a "transportability study" the written examination used is valid and does not have an adverse racial impact. The examination used by the City of Cincinnati has been compared with similar tests in other cities and determined to be statistically reliable. The results of such comparable tests may therefore be "transported" to any city with similar jobs and deemed valid in that city. Evidence presented to the Court indicated that during the 1985–86 fire recruit hiring process, 186 out of 390 blacks who took the written examination (48%) scored well enough to continue beyond the written test while 149 out of 815 whites who took the examination (approximately 18%) scored well enough to continue. (Deft.Ex. NN). The statistics show that during the 1988–89 hiring process, 52% of blacks and 32% of whites who took the written examination were continued in the process. (Deft.Ex. B). In 1990, 58% of blacks and 93% of whites scored well enough to continue. (Deft.Ex. C). (Statistics for 1987 were not presented to the Court.) The results seem to vary so substantially that no conclusion of disparate impact can be drawn. 48% of blacks to 18% of whites passing in 1985–86 shows a 30% variation in favor of blacks while 58% of blacks to 93% of whites passing in 1990 is a 35% variation in favor of whites.

4. No assertion has ever been made that either the physical ability test or the medical examination had an adverse impact upon blacks since the percentages of black and white applicants (those individuals who took the written examination) who remained in the "pipeline" after undergoing these examinations are as follows: 1985–86—23% of blacks and 11% of whites (Deft. Ex. NN); 1987–88—approximately 11% of blacks and 8% of whites (Deft.Ex. A); 1988–89—approximately 27% of blacks and 18% of whites (Deft.Ex. B); 1990—approximately 21% of blacks and 16% of whites (Deft.Ex. C).

5. The final step for selection is known as the "Round Robin Process." The applicants are investigated, polygraph summary reports are included, and a determination is made by a group consisting of the Fire Chief, the Public Safety Director, and a representative of Civil Service, as to whether a fire recruit meets or does not meet the selection criteria. The determination in the Round Robin Process is made without any knowledge of the applicant's race. Evidence presented to the Court demonstrated that during the 1985–86 hiring process, 9% of black applicants continued beyond that step while 8% of white applications continued in the process. (Deft.Ex. NN). The figures for subsequent years were: 1987–88—4% of both blacks and whites (Deft.Ex. A); 1988–89—17% of blacks and 13% of whites (Deft.Ex. B); 1990—9% of blacks and 8% of whites (Deft.Ex. C).

6. Plaintiffs have presented no evidence that defendants hired white applicants without subjecting them to the full screening process, specifically the Rule of Three step. Plaintiffs have also failed to demonstrate that the Rule of Three procedure had an adverse impact on blacks since at this stage of the hiring process, blacks were compared only with other blacks.

7. The Consent Decree in paragraph 22 provides in part as follows:

Subject to the availability of qualified applicants, Defendant shall adopt and seek to achieve a goal of hiring significant numbers of minority persons to achieve a work force composition which will not support an inference of racial discrimination in hiring. *Such goal shall be deemed to have been achieved when at least 18% of the Division of Fire Personnel of the City of Cincinnati are minority persons....* (Emphasis added).

As of August, 1990, the total Fire Division employment was 813, of whom 189 were blacks for a black employment percentage of 23.2%. The figure of 18% was achieved in January, 1987, and that figure has been exceeded ever since. The nature of the increase on a yearly basis is demonstrated by Defendant's Exhibit II, which is attached hereto.

8. Plaintiffs have presented no evidence which demonstrates that the racial composition of the City of Cincinnati's workforce has changed significantly since the Consent Decree was implemented.

9. Paragraph 34 of the Consent Decree provides in part as follows:

The Court will retain continuing jurisdiction of this action for such further relief or other orders as may be appropriate *pending a showing of compliance with the terms of this Decree.* (Emphasis added).

The City of Cincinnati has complied with that portion of the Consent Decree entitled "Testing Procedures, containing paragraphs 15, 16, and 17, the section entitled "Other Selection Processes," containing paragraphs 18, 19, and 20, the section entitled "Hiring," consisting of paragraphs 21, 22, 23, 24, 25, and 26; and the section entitled "Records," containing paragraphs 28, 29, and 30.

10. The section entitled "Promotions," identified as paragraph 27, provides as follows:

Defendant shall use a system for promoting qualified minority persons within the ranks of the Division of Fire to achieve a goal of a work force composition which negates any inference of an unlawfully discriminatory promotion policy based on race.

No evidence in connection with this provision has been presented to the Court and this section will be dealt with separately.

## III.

## OPINION

It is no longer subject to question that the basic purpose of the Consent Decree has been achieved. There is a reference in the opinion of the United States Court of Appeals for the Sixth Circuit that in 1973 "the Cincinnati Firefighter Force was only 0.5% black ..." In an effort to correct this imbalance the Consent Decree established procedures for the hiring of blacks which, in fact, violate the Civil Service laws of the

State of Ohio. The authority to do so for the limited purpose of correcting a racial imbalance is not in dispute. The net result is that the stated intention of the Consent Decree has been achieved and over-achieved, arguably, at the expense of those who have relied upon the Civil Service laws. The only questions before the Court are whether or not it may terminate jurisdiction over this matter and dissolve the consent decree in whole or in part. Based upon the Findings of Fact herein, the Court determines that in those instances where stated objectives of the Consent Decree have been achieved, the portions of the consent decree dealing with those aspects should be dissolved. *See Bd. of Educ. of Okla. City Public Schools v. Dowell,* — U.S. ——, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991); *Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976).

■ The Court has addressed the dilemma for the City of Cincinnati created by the conflict between the Civil Service laws of Ohio and the Consent Decree in the case of *Jansen v. City of Cincinnati,* currently on appeal to the United States Court of Appeals for the Sixth Circuit. It is this Court's position that such laws may be circumvented when, as here, there has existed a clear need for court supervision to insure a greater minority participation in the Fire Division. The sole issue, however, is one of supervision of a specific consent decree. The remedies available to the Plaintiffs do not exist only in the United States District Court. There are alternatives that do not require Court intervention, which inherently sweeps aside the considered decisions of a sovereign state. The Civil Service Laws of Ohio (Ohio Revised Code Chapter 124) do not have the force and effect of constitutional guarantees. Those laws may be amended at any time the General Assembly of Ohio elects to do so. An example of such amendment that might be noted in passing is "Veteran's Preference," which was enacted by the General Assembly to meet a perceived need at the time.

If the Plaintiffs are unable or unwilling to obtain changes in the Civil Service law, they need only avail themselves of Revised Code § 124.90. That section provides in part as follows:

(A) Any municipal corporation may, by a two-thirds vote of its legislative authority, *waive, suspend, or alter any of the provisions of this chapter* as they apply to that municipal corporation if such waiver, suspension, or alteration is necessary for the municipal corporation to comply with any federal law or any rules adopted pursuant to federal law *concerning discrimination in employment.* (Emphasis added).

A legislative solution to this problem, either through the State of Ohio or the City of Cincinnati, has the benefit of being a determination of elected representatives: perpetual supervision by an individual United States District Judge does not.

■ In view of the foregoing, the Court does specifically deny Plaintiffs' Motion to Enforce as not being supported by a preponderance of the evidence. The Court rejects plaintiffs' claim that blacks were improperly eliminated from the general applicant pool during the 1986–87 hiring process for lack of any evidence. The statistical evidence does not support a finding that during subsequent years, defendants' employment practices caused the exclusion of blacks from firefighter positions because of their race.

■ The Court also denies plaintiffs' motion to modify the consent decree. Plaintiffs have not presented evidence which demonstrates that the 18% minority hiring goal is no longer sufficient to dispel the inference that the City's hiring practices are discriminatory. The evidence demonstrates conclusively that the goal of the 18% hiring figure—the eradication of discriminatory hiring—has been achieved. (See Attachment A).

The Court does hereby terminate jurisdiction over all aspects of hiring by the City Fire Division. Those portions of the consent decree governing hiring practices are hereby dissolved. The Court will retain jurisdiction for a limited period of time over

Consent Decree paragraphs 10 and 11 entitled "Recruitment" and paragraph 27 entitled "Promotions." Plaintiffs are directed to show cause within thirty (30) days of the date of this Order why the Court should not likewise terminate its supervision over paragraphs 10, 11 and 27, since no evidence has been presented of any violation thereof.

The Court will likewise retain jurisdiction for a limited period over paragraph 33 entitled "Costs." Plaintiffs are directed within thirty (30) days of the date of this Order to present any requests for costs and fees incurred to this date.

## IV.

### CONCLUSIONS OF LAW

A. This Court has jurisdiction pursuant to 42 U.S.C. § 1983.

■ B. In order to establish a prima facie case of discrimination under a disparate impact theory, plaintiff must first identify a specific employment practice of the employer and then show an adverse effect caused by the employment practice by offering "statistical evidence of a kind and degree sufficient to show that the practice in question had caused the exclusion of applicants for jobs ... because of their membership in a protected group". *Abbott v. Federal Forge, Inc.*, 912 F.2d 867, 872 (6th Cir.1990).

■ C. A Consent Decree which provides for favored treatment of minorities in order that the total employment percentage of that minority be increased is not per se invalid and represents an acceptable method of correcting a racial imbalance. *Youngblood v. Dalzell*, 804 F.2d 360 (6th Cir.1986).

■ D. Consent decrees which operate to violate the Civil Service laws of Ohio must be strictly construed and not extended beyond the specific terms thereof. *Fullilove v. Klutznick*, 448 U.S. 448, 491, 100 S.Ct. 2758, 2781, 65 L.Ed.2d 902 (1980).

■ E. Where a stated percentage of minority employment has been achieved for a substantial period of time, that portion of a consent decree governing such hiring practices is at an end and may be dissolved. *Board of Education of Oklahoma City Public Schools v. Dowell*, 111 S.Ct. 630 (1990).

■ F. A consent decree which includes both hiring and promotional practices is severable and a Court may terminate jurisdiction over the hiring practices set forth therein while not affecting the validity of the promotional aspects of such decree.

LET JUDGMENT ISSUE IN ACCORDANCE WITH THE FOREGOING.

1388

## Percentage Black Employment

**% BLACK EMPLOYMENT**

**DATE OF AFFIRMATIVE ACTION REPORT**