Gregory TYE, et al., Plaintiffs,

v.

CITY OF CINCINNATI,
et al., Defendants.

No. C-1-89-124.

United States District Court,
S.D. Ohio, W.D.

May 21, 1992.

Marc David Mezibov, Sirkin, Pinales, Mezibov & Schwartz, Clarence Daryl Williams, III, Williams & Shabazz Co., John Egnew Schrider, Jr., Legal Aid Soc. of Cincinnati, Cincinnati, Ohio, for plaintiffs.

Mark Carl Vollman, Loeb, Ney, Vollman, Harper & Friedmann, Cincinnati, Ohio, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SPIEGEL, District Judge.

The Court held a bench trial on February 3–6, and April 6–8, 1992. The following

items have been filed with the Court, which the Court has carefully considered: the Plaintiffs' proposed findings of fact and conclusions of law (doc. 63), the Defendants' trial brief (doc. 68), the Defendants' proposed findings of fact and conclusions of law (doc. 69), the Defendants' motion to dismiss (doc. 75),[1] the Plaintiffs' response (doc. 76), the Defendants' supplemental trial brief (doc. 83), the Plaintiffs' post-trial brief (doc. 89), the Plaintiffs' amended proposed findings of fact and conclusions of law (doc. 90), the Defendants' post-trial proposed findings of fact and conclusions of law (doc. 91), the Defendants' post-trial brief (doc. 92), and the Plaintiffs' reply (doc. 93).

In rendering our decision of this matter, we have considered the testimony of the witnesses, the documents admitted into evidence, as well as the items filed with this Court.

In weighing the testimony of the witnesses, we have considered each witness' relationship to the Plaintiffs or to the Defendants; their interest, if any, in the outcome of the trial; their manner of testifying; their opportunity to observe or acquire knowledge concerning facts about which they testified; and the extent to which their testimony was supported or contradicted by other credible evidence.

The sole issue before this Court is whether the Defendants violated the consent decree of *Youngblood v. Dalzell*, Civil No. 8774, (S.D.Ohio May 7, 1974) (*"Youngblood I"*) (J. ex. I) [hereinafter referred to as consent decree or *Youngblood I* consent decree], during the 1985–87 hiring process.

Under Fed.R.Civ.P. 52, we now set forth our findings of fact and conclusions of law.

## FINDINGS OF FACT

1. The Plaintiffs are Gregory Tye, Roderick Hines, Timothy Calloway, Vernon Simpson, and Johny Dudley. They are black. All five applied for the position of fire recruit with the Cincinnati Fire Division during the 1985–1987 hiring process.

The City of Cincinnati denied all five Plaintiffs positions as a fire recruits.

2. The Defendants are the City of Cincinnati (or "City"), a municipal corporation, the Civil Service Commission, and the City Manager and Fire Chief from 1985–1987.

### A Brief History

3. In order to better understand the litigation before the Court, we must first survey the history of this dispute.

4. In 1973, two black applicants, who had been rejected for positions as fire recruits, sued the City. They alleged that various City officials practiced racial discrimination in the hiring and promotion of firefighters.

5. At the time this lawsuit was filed, less than one percent of the City of Cincinnati's approximately 800 firefighters were black.

6. On May 7, 1974, the parties entered into a court-approved consent decree. It is this consent decree which is central to the litigation that is now before this Court.

7. The purpose of the *Youngblood I* consent decree was to eliminate discriminatory hiring and promotion practices in the City's Fire Department. It provided the following: (1) goals and time-tables for increasing the proportion of minorities; (2) procedures for recruiting minority applicants; and (3) requirements concerning the selection process.

8. In pertinent part, the consent decree enjoined the City from:

[a]ny act or practice which has the purpose or effect of wrongfully discriminating against any minority applicant or potential applicant, or any minority employee of the division of fire, because of such individual's race with respect to recruiting, testing, selecting, hiring, training, conditions of employment and promotions, and from engaging in any other acts or practices which have the purpose

---

1. This Court denied the Defendants' motion to dismiss by an earlier Order (doc. 77). However, in that Order, we stated that we would examined the grounds for the Defendants' motion to dismiss at trial. Therefore, we now examine the merits of the Defendants' motion to dismiss.

or effect of denying equal employment opportunities to minorities.

J. ex. I, ¶ 8.

9. The consent decree further states: Subject to the provisions of this paragraph, Defendants may continue to utilize background investigations. Defendants shall review the form of the background investigation to determine whether the items which comprise it are reasonably related to successful job performance and whether said items have an adverse impact on minority applicants. If the background investigation currently utilized has a disproportionately adverse impact on minority group applicants, the Plaintiffs may apply to the Court for determination as to whether continued use of the background investigation constitutes unlawful discrimination. In the absence of such a determination, the Defendants may continue to use background investigations, insofar as no information concerning arrest records is solicited or recorded by the investigator, information concerning criminal convictions is evaluated in compliance with Paragraph 14, above, and the background of minority applicants is investigated and said applicants are interviewed by at least one person of the same race as the applicant.

*Id.* at ¶ 20.

10. The consent decree also states that: Defendants shall not ask for arrest records on the application for the position of fire recruit or in any background investigation of potential fire recruits and shall not consider arrests as a criterion in the selection of fire recruits. Felony and misdemeanor convictions shall not be considered as criteria of employment unless Defendants can demonstrate that the conviction is related to job performance. Names of applicants rejected for employment on the basis of criminal convictions shall be furnished in writing to Plaintiffs.

*Id.* at ¶ 14.

11. The Plaintiffs in the case before this Court are members of the Plaintiff class in *Youngblood I.*

### *The Hiring Process*

12. The 1985–1987 hiring process for positions as fire recruits with the City of Cincinnati was a five step process. It consisted of (1) a written examination; (2) a medical examination; (3) a physical ability examination; (4) a background investigation and round robin selection process; and, (5) the so-called "rule of three."

13. Applicants had to pass each of the five steps in order to be offered a position as a fire recruit.

14. In the matter before this Court, all five Plaintiffs passed the written test,[2] the physical ability test, and the medical examination. Therefore, this Court's attention is focused on the background investigation/round-robin step and the rule of three.[3]

15. The background investigation step consisted of a two-part personal history questionnaire, a polygraph examination and report, a home interview, and the round robin process.

16. In the personnel history questionnaires, the City inquired into such areas as: the credit and financial history of applicants, the employment history of applicants, the unusual sexual conduct of appli-

---

**2.** In order to have more minority fire fighters pursuant to the consent decree, the City had lower passing scores on the written examination for blacks than for whites in the 1985–87 hiring process.

**3.** Plaintiff Johny Dudley passed the written examination, medical examination, and physical ability test, but was eliminated at the background investigation and round robin process. Plaintiffs Timothy Calloway, Roderick Hines, and Vernon Simpson were eliminated at the background investigation and round robin

process. Each of these Plaintiffs successfully appealed his disqualification to Assistant Safety Director David Rager. Mr. Rager granted their appeals and they were placed on the eligible list. Plaintiff Gregory Tye passed the background investigation and round robin process and was placed on the eligible list along with the other applicants who passed the first four steps. Ultimately, none of the Plaintiffs were offered positions as fire recruits during the 1985–87 hiring process.

cants, and the past criminal conduct of applicants.

17. In addition, the City inquired about applicants' past arrests.[4] This question was on the personal history questionnaire because during the 1985–87 hiring process because, the police and fire application processes were combined, and a question about arrests was asked in hiring for policemen.

18. The next part of the background investigation was the polygraph examination. In the polygraph examination, the examiners asked follow-up questions about information listed by applicants on their personal history questionnaires.

19. The polygraph examination was not designed to discern whether or not applicants were truthful. Instead, the City used the polygraph to intimidate applicants into telling the truth. The City found that many applicants divulged information that was not contained in their personal history questionnaire when they were hooked up to a polygraph machine.

20. During the polygraph examination, each applicant was examined separately. The polygraph examiner told applicants that nothing they said would be used against them. However, the information which applicants revealed was often the reason that the City refused to hire a particular applicant.

21. The polygraph examiner prepared a summary report based on information given by each applicant during the examination. This report was used, among other things, to evaluate the applicants during the round robin.

22. The polygraph examiners included on all the reports an opinion of the polygrapher as to whether or not the applicant exhibited signs of deception during the examination.

23. Fire Chief Wells conceded in his deposition admitted into evidence that he placed considerable weight on the polygraph examiner's opinion as to whether a candidate was being deceptive.

24. The background investigation also consisted of a home interview. In the home interview, an investigator of the Fire Department would question the applicant about becoming a fire fighter. Furthermore, the investigator would talk to the applicant's family, friends, employers, and others who might know something about the applicant. The investigator subsequently wrote a "thumbnail" of the candidate, which was used in the round robin and the rule of three.

25. The background investigation was concluded by the round robin process. The round robin was conducted by three City officials, including the Fire Chief, the Safety Director (or his designee), and the Secretary of the Civil Service Commission. These individuals considered all the information obtained about applicants, and then decided who would be placed on a list of persons eligible to be hired through the rule of three.

26. The round robin process was designed to ensure that all candidates met the minimum criteria adopted by the Civil Service Commission. However, the Fire Chief and the Safety Director were free to waive the criteria as they saw fit.

27. Any applicant rejected at the round robin, had the right to appeal that decision to the Safety Director.

28. Under the consent decree, the round robin process resulted in two separate eligible lists—one for whites and one for blacks. The City kept two separate eligible lists so that blacks would only be compared against blacks, and whites would only be compared against whites. Thus, the two separate eligible lists were designed to make sure that the City would meet the consent decree goal of 40% minority hiring. Since 1974, every class of fire recruits in the City of Cincinnati has had 40% minority composition.

29. The actual selection of fire recruits took place in the rule of three process. In

---

4. In addition, the City inquired about the arrests of applicants' relatives. However, scant evidence was presented that this question had an adverse impact on any of the five Plaintiffs, nor do the Plaintiffs highlight this issue in the items filed with the Court.

the rule of three process, the Fire Chief[5] considers the first three applicants on the eligibility list for filling a particular position.

30. The order of applicants on the two eligibility lists (one for whites, one for blacks) is determined by the applicants' respective scores on the written examination.

31. In the rule of three, the Fire Chief must choose one of the three applicants. Then, the Fire Chief considers the two remaining candidates along with the next candidate on the eligibility list for the next position, and so on. If an applicant is not selected after being considered four times, the applicant is no longer considered for a position.

32. There is no administrative appeal from the decisions made in the rule of three.

### The 1985–87 Hiring Process

33. In the 1985–87 hiring process, 87 black applicants and 92 white applicants passed the written examination, medical examination, and physical ability examination. The City's background investigation process eliminated approximately 60% of the black applicants, but only 30% of the white applicants.

34. In 1987, the City hired two classes of fire recruits. The first class was hired in July of 1986, and consisted of 21 whites and 14 blacks.

35. The second class was hired in July of 1987, and was composed of only 8 whites and 5 blacks. The City originally planned to hire a second class of 29 fire recruits. However, the City later decided to hire only 13 fire recruits, because there were not enough candidates on the minority eligible list to have the requisite 40% minority representation under the consent decree. The result was that the City filled 16 fewer positions than planned from the 1985–87 eligible list.

36. The Plaintiffs contend that although the City met the consent decree goal of 40% minority hiring, they were discriminated against because the City hired fewer fire fighters than intended as a result of improprieties in the hiring process.

37. In the summer of 1987, 12 white applicants who were on the eligibility list, but not hired, brought claims against the City for reverse discrimination in *Youngblood v. Dalzell*, Civil No. 8774 (S.D.Ohio) (J. Porter) ("*Youngblood II*").

38. In December 1987, the Court permitted a settlement of the litigation. The settlement stipulated that the eleven intervenors would be offered positions as fire recruits subject to their passing medical exams. Eight of these intervenors passed the medical exam and accepted positions with the Fire Department.

39. In addition, the City also hired three other nonminorities as fire recruits in 1987.

40. Subsequently, the City received authority from the District Court to reduce the number of white fire fighters to be hired in the next class of fire recruits in order to maintain 40% minority representation in the fire recruit class.

41. Thus, the next class of fire fighters consisted of 17 whites and 21 blacks. The number of whites was reduced by 11—the number of intervenors and other non-minorities that were hired.

42. Dr. Charles Cranny, an expert in industrial organizational psychology, testified on behalf of the Plaintiffs. Dr. Cranny testified that the background investigation/round robin component of the City's hiring process for fire recruits had an adverse impact on minorities.

43. Dr. Cranny supported this conclusion with a statistical analysis. Under Dr. Cranny's analysis, the adverse impact ratio of the City's hiring process was 39%.

44. Under the Uniform Guidelines on Employee Selection procedures, a selection rate for minorities that is less than 80% of the rate for whites is evidence of adverse impact. 29 C.F.R. § 1607.4D (1991). This is known as the four-fifths rule.

---

**5.** The Fire Chief made the decision in the rule of three, but those decisions were reviewed by the Assistant Safety Director, David Rager. If the Fire Chief disagreed with Mr. Rager's decision, he could ask the Safety Director to review the decision further.

45. Dr. Cranny further testified that the City's decision making for hiring of fire recruits was highly inconsistent. Dr. Cranny formed this opinion from an "impressionistic" analysis of a limited number of files which Plaintiffs' counsel provided him.

46. Dr. Cranny concluded that the City's lack of standardization in its hiring system was proof that the City's hiring process was not job-related.

47. Dr. Frank Landy, an expert in industrial organizational psychology, testified on behalf of the Defendants. In the past, he has conducted job analyses and developed tests for a variety of municipalities in their selection of firefighters.

48. Dr. Landy computed the adverse impact ratio of the City's hiring process as 136%. Thus, under Dr. Landy's analysis whites were the ones who suffered an adverse impact. If the intervenors and other non-minorities are considered, Dr. Landy testified that the adverse impact ratio was 100%, still well above the four-fifths rule.

49. Moreover, Dr. Landy opined that the City's hiring process was job-related. However, Dr. Landy was not aware that four of the 1987 intervenors were sons of current or former Cincinnati firefighters. They received jobs despite having incidents in their background which probably should have disqualified them in the round robin under the City's hiring criteria. However, Dr. Landy was also not aware that several other sons of firefighters had been denied positions with the Fire Department during the 1980's.

50. Thus, Dr. Landy concluded that the City's hiring process did not have an adverse impact, and therefore did not violate the *Youngblood I* consent decree.

51. We credit Dr. Cranny's testimony with regard to the statistical disparity in the elimination of blacks as compared to whites in the hiring process. This will be discussed in more detail in the next section.

## CONCLUSIONS OF LAW

The Plaintiffs claim that the Defendants violated the *Youngblood I* consent decree in two respects: (1) the Defendants improperly used arrest records in determining which applicants should receive offers to become a fire recruit; and, (2) the Defendants engaged in acts and practices which had the purpose or the effect of discriminating against the Plaintiffs because of their race.

We shall examine these contentions in turn, but first we must consider the threshold assertion by the Defendants that this matter is barred by the doctrines of *res judicata* and/or collateral estoppel.

### Res Judicata and Collateral Estoppel

The Defendants argue in their trial brief and in a motion to dismiss that this case is barred by the doctrines of *res judicata* and collateral estoppel. Specifically, the Defendants argue that the decision in *Youngblood v. Dalzell*, 777 F.Supp. 1382 (S.D.Ohio 1991) (J. Rubin) ("*Youngblood III*") bars further litigation of the matter before this Court.

■■■ *Res judicata*, or claim preclusion, prohibits the relitigation of claims in which the parties have already had a full and fair opportunity to litigate, and the court has reached a *final* judgment. *Marrese v. Am. Academy of Orthopaedic Surgeons*, 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985). Judge Rubin's decision in *Youngblood III* was not a final judgment. In a subsequent Order, Judge Rubin clearly stated that "... the order issued in this case on October 31, 1991 [i.e., *Youngblood III*], represents a judgment resolving fewer than all of the multiple claims raised by the plaintiffs and therefore is not a final appealable order." *Youngblood v. Dalzell*, Civil No. 8774 (Dec. 20, 1991) (J. Rubin) ("*Youngblood IV*"). Thus, since *Youngblood III* is not a final, appealable judgment, *res judicata* does not bar the matter before this Court.

The doctrine of collateral estoppel does not apply for a similar reason. Collateral estoppel, or issue preclusion, bars relitigation of an issue of fact or law that was actually litigated and determined by a valid and final judgment. Charles Alan Wright, *The Law of Federal Courts* § 100A, at 682 (4th ed. 1983) (but recognizing that the

requirement of a final judgment is applied less rigidly to collateral estoppel than it is to *res judicata* ). Because *Youngblood III* is not a final judgment, collateral estoppel does not bar the lawsuit before this Court.

■ More importantly, collateral estoppel does not bar the litigation now before this Court, because the issue in the case at bar has never been litigated. *See Teledyne Indus. v. Nat'l Labor Relations Bd.*, 911 F.2d 1214, 1220 (6th Cir.1990) (stating that collateral estoppel only applies if the issue has actually been litigated at an earlier time). In *Youngblood III*, the Plaintiff class withdrew their motion with respect to the 1985–87 hiring process in their pre-hearing memorandum. *See* doc. 76, ex. 2. Furthermore, Plaintiffs' counsel clearly stated to the Court that the Plaintiffs were not seeking relief with respect to the 1985–87 hiring process. *See* doc. 76, ex. 3. The issue before this Court, whether the City violated the consent decree in its 1985–87 hiring, has never before been litigated. Therefore, collateral estoppel does not apply.[6]

### Interpretation of the Consent Decree

■ A consent decree, although in one sense a final judgment to litigation, is in another sense a contract founded upon the agreement of the parties. *Vogel v. City of Cincinnati*, 959 F.2d 594, 598 (6th Cir. 1992); *Long v. City of Saginaw*, 911 F.2d 1192, 1201 n. 5 (6th Cir.1990). Thus, courts must interpret a consent decree based upon the respective positions for which the parties bargained. *Vogel*, 959 F.2d at 598.

### Arrest Records

■ The Defendants admit that "[t]he City's questionnaire for the position of firefighter contained a question about arrests

which is prohibited by paragraph 14 of the Consent decree." Defendants' Proposed Findings of Fact and Conclusions of Law, Doc. 69, at 20.

The information about arrests was asked of both black and white applicants. The question about arrests appeared on the personal history questionnaires because the City combined the hiring of the police and firefighters on one form, and there was no prohibition of asking police applicants about arrests.

In interpreting the *Youngblood I* consent decree, this Court must base its analysis upon the positions that the parties bargained for in entering that consent decree. *See Vogel*, 959 F.2d at 598. Thus, the *Youngblood I* consent decree must be strictly construed. *U.S. v. ITT Continental Baking Co.*, 420 U.S. 223, 235–238, 95 S.Ct. 926, 933–935, 43 L.Ed.2d 148 (1974). In the *Youngblood I* consent decree, the parties clearly prohibited the City from seeking information from applicants about their arrest records. J. ex. I, at ¶ 14.

The Plaintiffs, Gregory Tye, and Vernon Simpson, admitted on their personal history questionnaire that they had been arrested, but were not convicted. While City officials denied on the witness stand that they had used arrest records in making hiring decisions, contemporaneous evidence indicates otherwise. Fire Chief Wells kept notes as to the reasons for rejecting various applicants. Defendants' Trial ex. T. Fire Chief Wells noted that Plaintiff Vernon Simpson had spent "... 18 hours in jail for purse snatching...." *Id.* Similarly, Fire Chief Wells wrote that Plaintiff Gregory Tye had "... arrest problems...." *Id.* Thus, we conclude that City officials used information about arrests in making hiring decisions for the Fire Department. Clear-

---

6. We also note that in January 1989, the District Court in *Youngblood v. Dalzell*, No. 3774 (J. Rubin) declined to hear the claims of the individuals who became the Plaintiffs in this matter and ordered the *Youngblood v. Dalzell* consent decree closed. As a result, the Plaintiffs in this case filed this action.

The United States Court of Appeals reversed the closure of the *Youngblood v. Dalzell* case, but it recognized the right of these Plaintiffs to

continue in this lawsuit. *Youngblood v. Dalzell*, 925 F.2d 954, 959 n. 3 (6th Cir.1991). Thus, this is the first court to hear the claims of these Plaintiffs. Moreover, the Plaintiffs have complied with ¶ 20 of the consent decree which requires the Plaintiffs to apply to the Court for determination as to whether the background investigation constituted unlawful discrimination.

ly, the City has violated the terms of the *Youngblood I* consent decree.[7]

Accordingly, this Court concludes that the City is liable to Gregory Tye and Vernon Simpson for violating the *Youngblood I* consent decree.[8]

### Discriminatory Acts or Practices

The consent decree bars any acts or practices which have a discriminatory purpose or effect by the City in the hiring of fire recruits. J. ex. I, at ¶ 8. In order to determine whether the City has violated this prohibition of the consent decree, we adopt a Title VII frame of analysis.[9]

■■■ The Supreme Court set forth the Title VII theory of adverse impact in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).[10] Under *Griggs,* selection devices for hiring which have an unjustified adverse impact on minorities violate Title VII. *See also Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). In order to establish a *prima facie* case of adverse impact, plaintiffs must establish two elements: (1) that there is adverse impact in hiring demonstrated through statistical evidence; and, (2) that the disparity plaintiffs complain of is the result of one or more of the employment practices challenged. *Wards Cove,* 109 S.Ct. at 2121, 2125.[11]

■■ Thus, we must first determine whether the Plaintiffs have established a statistical disparity between the hiring of whites and blacks, and then whether the disparity is the result of the City's hiring practices. One would assume that the parties could stipulate to the relevant statistics. In this case, however, the parties vigorously disagree with each other. Dr. Cranny testified on behalf of the Plaintiffs that the adverse impact ratio was 39%; whereas, Dr. Landy testified for the Defendants that the adverse impact ratio was at least 100%.

This Court must determine which analysis is proper. Dr. Landy compared the number of blacks and whites who took the written test with the number of blacks and whites ultimately offered positions. For each component[12] in the hiring process, Dr. Landy compared the number of blacks and whites who passed that component with the number of blacks and whites who took the written examination. Dr. Cranny, on the other hand, examined each component of the hiring process. Thus, Dr. Cranny examined the number of blacks and whites who attempted a certain component in the process with the number of blacks and whites who passed that component.

**7.** Even the Defendants' expert, Dr. Landy, testified that the City erred by inquiring about arrests. Dr. Landy explained that arrests or a lack of arrests is not indicative of job competence.

**8.** This Court determined in a March 29, 1992 Order that the Plaintiffs in this case could seek individual relief.

**9.** The 1991 Civil Rights Act does not apply to this case, because the United States Court of Appeals for the Sixth Circuit has held that its provisions are not retroactive. *Vogel,* 959 F.2d at 597.

**10.** The City argues strongly that it did not intentionally discriminate against minorities in its hiring process. We agree that the evidence showed that the City has not engaged in intentional discrimination. However, under adverse impact analysis, the Plaintiffs need not show intentional discrimination to prevail. *Wards Cove v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 2119, 104 L.Ed.2d 733 (1989).

**11.** The City further argues that because it has hired 40% minorities in each class of fire recruits since 1974, that there has been no adverse impact against minorities. The Supreme Court has clearly rejected this bottom-line analysis. *Connecticut v. Teal,* 457 U.S. 440, 454–55, 102 S.Ct. 2525, 2534–35, 73 L.Ed.2d 130 (1982) ("... Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group"); *Wards Cove,* 109 S.Ct. at 2123–24 and n. 8 ("... even if petitioners could show that the percentage of selected applicants who are nonwhite is not significantly less than the percentage of qualified applicants who are nonwhite, respondents would still have a case under Title VII, if they could prove that some particular hiring practice has a disparate impact on minorities, notwithstanding the bottom-line racial balance in petitioner's workforce").

**12.** A component is a step in the hiring process in which some applicants are deemed ineligible, and therefore do not receive a job offer.

Dr. Landy's conclusions as to the adverse impact ratio tend toward bottom-line analysis. In *Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982), the Supreme Court invalidated bottom-line analysis. The *Teal* court reasoned that Congress, in enacting Title VII, was attempting to establish equality of opportunity at all levels in the hiring process. *Id.* at 449–50, 454–55, 102 S.Ct. at 2534–35.

In determining whether the background investigation and round robin had a discriminatory effect, this Court finds that it is more revealing to consider the number of whites and blacks who entered a particular step and passed it, than it is to compare the number of whites and blacks who took the written examination with the number of whites and blacks who passed the background investigation and round robin. We adopt Dr. Cranny's analysis because it better focuses in on whether any of the steps in the City's hiring process had a discriminatory effect. Thus, under *Wards Cove*, the Plaintiffs have established a *prima facie* case by showing that a statistical disparity exists as a result of the Defendants' employment practices in the background investigation/round robin and the rule of three.

■ However, this does not end our inquiry. Under the consent decree, once the Plaintiffs have established their *prima facie* case, the burden of production shifts to the Defendants to show that the challenged selection devices are job-related. *See* J. ex. I, at ¶ 20; *see also Teal*, 457 U.S. at 446–47, 102 S.Ct. at 2530–31; *Wards Cove*, 109 S.Ct. at 2126 (holding that burden of persuasion does not shift, but that the City has the burden of producing evidence of a business justification). Thus, the City can still prevail if it can show that its hiring process was job-related. *Id.*

■ A hiring process is job-related if the hiring criterion directly relate to a prospective employee's ability to perform the job effectively. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 1005, 108

S.Ct. 2777, 2794, 101 L.Ed.2d 827 (1987). In order to show job-relatedness, the employer does not need to show that the practice was absolutely necessary or indispensable to the operation of the business, but rather, that the practice substantially promoted the efficient operation of the business. *Chrisner v. Complete Auto Transit, Inc.*, 645 F.2d 1251, 1262 (6th Cir.1981).

The Plaintiffs argue that the Defendants have not met their burden that the selection devices were job-related. The Plaintiffs' expert, Dr. Cranny, testified that a hiring process cannot be shown to be job-related unless a job analysis is performed. A job analysis is a formal study of the requirements of a particular job, followed by an examination of the appropriate methods designed to select the individuals who can fulfill those requirements.

■ We refuse to adopt the rigid requirement that a hiring process cannot be job-related unless a job analysis is done. Every day applicants are hired for positions without the employer hiring an industrial psychologist to conduct a formal job analysis. Employers use their knowledge of the skills needed to successfully fill the position and their common sense to determine which applicant should be hired. We refuse to hold the City to a higher standard than we would any other employer. In fact, a public employer hiring a firefighter is held to a lighter burden in demonstrating that its employment criteria is job-related, because of the potential risk to public safety of hiring incompetent firefighters. *Zamlen v. City of Cleveland*, 906 F.2d 209 (6th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1388, 113 L.Ed.2d 444 (1991) (recognizing a lighter burden for employers of firefighters); *Chrisner*, 645 F.2d 1251.

■ The Plaintiffs also argue that the hiring process for fire recruits was not job-related because it was random and inconsistent.[13] In support of this position, the Plaintiffs put forth into evidence various mistakes that the City had made in its

---

**13.** Dr. Cranny, the Plaintiffs' expert, testified that the City's background investigation was not job-related because of the lack of standardization in the process. He based this on an impressionistic review of a limited number of files provided by the Plaintiffs' counsel.

hiring process. For instance, Plaintiff Johny Dudley was not hired because he was allegedly fired by an employer in 1985. In fact, the employer accurately reported to the City that Johny Dudley had resigned. *See* Plaintiffs' trial ex. 9. However, anecdotal evidence of mistakes made by the City in hiring particular fire recruits does not mean that the City's *process* was not job-related. *See Watson*, 487 U.S. 977, 108 S.Ct. 2777 (considering job-relatedness in terms of a hiring process).

Instead, we must determine whether the City's process of hiring fire recruits was job-related. A firefighter holds a position of public trust. He or she is employed by the people to combat the dangers of fire. A firefighter has access to people's homes and possessions. The City has a responsibility to select fire recruits who can live up to the people's trust. Thus, as Dr. Landy testified the City's firefighters had to be honest, responsible, work well with others, and work well under stress.

Biographical information about candidates is useful in predicting the success of an applicant in a particular position. Employers across the country require candidates to provide biographical information before a candidate is hired. In the personal history questionnaires, the City of Cincinnati inquired into certain areas of fire recruit applicants, such as: the credit and financial history of applicants, the employment history of applicants, the unusual sexual conduct of applicants, and the past criminal conduct of applicants.[14] This Court holds that requiring such biographical information was relevant for the City to find qualified fire recruits.

The Plaintiffs also claim that the use of the polygraph examination was not job-related. This Court has its own reservations about a hiring system in which applicants are told that nothing they say will be held against them, but the employer proceeds to reject applicants based upon what the applicant reveals. However, this Court is not adjudicating the ethics of the City's

actions; rather the issues before it is whether the City's hiring process was job-related.

The uncontradicted testimony at trial was that the polygraph examination intimidated many applicants to reveal further information about their background. Certainly, some applicants may have consistently lied throughout the hiring process, as Dr. Cranny noted. However, the polygraph examination did, on average, help to reveal more information about candidates, which allowed the City to make a more informed choice about its hiring decisions. Although the City may have made errors on particular applicants, this Court finds that the City's hiring of fire recruits in 1985–87 was job-related.

Despite the fact that the City has shown that its hiring process was job-related, our inquiry is still not at an end. Because the City has met its burden, the burden shifts to the Plaintiffs to demonstrate that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in finding excellent fire recruits. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1989).

The Plaintiffs offered no evidence of other tests or selection devices devoid of a racially discriminatory effect, that would allow the City to hire high quality fire recruits. Therefore, the Plaintiffs have not met their burden to demonstrate alternative tests or selection devices.

Because the City's hiring process was job-related, we conclude that the City's hiring process for fire recruits did not have a discriminatory effect or purpose. Therefore, ¶¶ 8 and 20 of the *Youngblood I* consent decree were not violated. Accordingly, Plaintiffs Johny Dudley, Roderick Hines, Timothy Calloway and are not entitled to recover from the City.

### CONCLUSION

Accordingly, after careful consideration, this Court concludes that Plaintiffs Vernon

---

**14.** The City also inquired into the past arrests and other police contacts of applicants, but that was discussed in the above section.

Simpson and Gregory Tye may recover because the City has violated ¶ 14 of the *Youngblood I* consent decree. However, Plaintiffs Johny Dudley, Roderick Hines, and Timothy Calloway may not recover, because the City did not violate the *Youngblood I* consent decree with regard to their claims.

SO ORDERED.